MARTHA LOGAN *v.* GREENWICH HOSPITAL
ASSOCIATION ET AL.
(10969)

HEALEY, PARSKEY, SHEA, GRILLO and BIELUCH, Js.

Argued June 3—decision released September 6, 1983

*Charles W. Fleischmann,* with whom, on the brief, was *Keith D. Dunnigan,* for the appellant (plaintiff).

*Ronald D. Williams,* for the appellees (named defendant and defendant Forbes Delany).

*Gregory C. Willis,* with whom, on the brief, was *Bruce M. Killion,* for the appellee (defendant Peter Bogdan).

*W. Patrick Ryan,* with whom, on the brief, was *Charles A. Deluca,* for the appellee (defendant Marc E. Newberg).

SHEA, J. In this medical malpractice action the trial court directed a verdict for the defendant hospital and for one of the three doctors whom the plaintiff had named as defendants. The jury returned a verdict for the other two defendant doctors. The plaintiff has appealed, claiming error in the direction of the verdicts and in the charge to the jury. The principal issue raised involves the propriety of the court's instruction that the duty of a physician to advise a patient of possible alternatives in obtaining an informed consent to a contemplated operative procedure does not require the disclosure of a more hazardous alternative. We find error in this instruction and order a new trial limited to the absence of informed consent theory of the complaint. We affirm, however, the direction of a verdict for two of the defendants as well as the verdict reached by the jury for one of the defendants whose request for a directed verdict was denied.

The evidence was that the defendant Marc E. Newberg, a specialist in internal medicine, first met the plaintiff in July, 1971, following the birth of her twin children at the Greenwich Hospital. After her discharge from the hospital on August 4, 1971, the plaintiff continued to consult Newberg because of continued pain, swelling and a decreased range of motion. She was hospitalized for ten days in February, 1972, because of pain in her neck, shoulders, arms, and legs which interfered with her sleeping.

In August, 1972, Newberg advised the plaintiff that she had systemic lupus erythematosis (lupus). In October, 1972, he advised her to undergo a kidney biopsy to determine the extent of lupus involvement in her

kidneys. He explained that the biopsy was a simple procedure, which would be carried out under a local anesthetic, that she might suffer some bleeding and discomfort, but that she would be able to leave the hospital in a day or two if there were no complications. Newberg described the operation in a general way as consisting of the insertion of a surgical needle into her back in order to obtain a specimen of kidney tissue. He also indicated that Peter Bogdan, a urologist, would perform the operation and would describe the details more fully. The only complication which Newberg mentioned was the possibility of considerable pain and bleeding for which surgery might be necessary. He did not discuss the alternative of an open biopsy, which would require an incision and would be conducted under general anesthesia, because he did not consider that procedure advisable. He never mentioned the danger that the plaintiff's gall bladder might be punctured during the operation, an injury which did in fact occur.

As the attending physician, Newberg admitted the plaintiff to the Greenwich Hospital on October 31, 1972. On the evening of November 2, 1972, the defendant Peter Bogdan visited the plaintiff in her room at the hospital to discuss the operation to be performed the next morning. He told her that there might be some bleeding and that there was a risk of hemorrhaging and of losing a kidney. The alternative of an open biopsy procedure under a general anesthetic was not mentioned, although Bogdan had performed such operations previously and conceded that it was a more controlled procedure in terms of visualizing the kidney. He did not consider this procedure to be a viable alternative for the plaintiff, however, because there is a greater risk of complications, especially those involving general anesthesia. After Bogdan had departed, the

plaintiff, in accordance with the rules of the hospital, signed a written form consenting to the surgical procedure which had been described.

The next morning the plaintiff was taken to a room in the x-ray department of the hospital where Bogdan and a student nurse were in attendance. The defendant Forbes Delany, the director of radiology at the hospital, was also present for the purpose of operating the fluoroscopic equipment which was necessary to provide a view of the kidney and the needle while the biopsy was being performed. Bogdan explained the procedure, advising the plaintiff that she would lie prone upon an x-ray table with a pillow under her upper abdomen and that he would give her instructions throughout the procedure.

The fluoroscopic equipment used consisted of a tube underneath the table on which the patient would lie. X-rays would pass through the table and the body of the patient onto a fluorescent screen augmented by a television system which improved the clarity of the image. Because the screen must be positioned above and rather close to the portion of the body being visualized there is insufficient space to allow for manipulation of the biopsy needle and the screen can be used only intermittently. The fluoroscope is not energized any longer than necessary in order to minimize radiation to the patient and the hands of the surgeon.

After the plaintiff had been placed upon the table, Bogdan injected a local anesthetic into the kidney region by using a small gauge anesthesia needle. He then inserted the biopsy needle and, using the fluoroscopic screen between six and eight times, he located the kidney and extracted a tissue specimen. After examining the specimen he concluded that it was inadequate. He made a second attempt to obtain a piece of

kidney tissue, advising the plaintiff beforehand and obtaining her consent. He adjusted the biopsy needle in order to obtain a deeper piece of kidney tissue and once again inserted it. In the course of this procedure the plaintiff suddenly felt pain far more severe than previously experienced and the needle was withdrawn before the tissue specimen could be obtained. During abdominal surgery on November 6, 1972, to determine the cause of the abdominal pain which the plaintiff continued to suffer following the biopsy procedure, it was discovered that her gall bladder had been punctured and it was removed.

The complaint was in two counts, the first being directed against the defendant hospital and the second against the three doctors who in some manner had been connected with the biopsy procedure. One of the specifications of negligence in each count was the failure "to obtain the plaintiff's intelligent and informed consent to the performance of a percutaneous renal biopsy."

## I

The plaintiff's first claim of error involves the charge upon the absence of informed consent as alleged in the complaint, particularly with respect to the duty of a physician to advise a patient of feasible alternatives.[1] The court instructed the jury that the duty to give a patient all information material to the decision to undergo an operation includes the obligation to advise

---

[1] This portion of the charge was as follows:

"The theory of informed consent imposes a duty upon a doctor which is completely separate and distinct from his responsibility to skillfully diagnose and treat the patient's ills. A physician is bound to disclose all known material risks peculiar to the proposed procedure. Materiality is defined as the significance a reasonable person in what the physician knows, or should know, in his patient's position would attach to the disclosed risk or risks in deciding whether to submit or not to submit to the renal biopsy. It is the duty of the physician to give a patient whose situation otherwise permits it all information material to the decision to undergo the proposed

of feasible alternatives. The charge continued: "Now the duty to warn of alternatives exists only when there are feasible alternatives available. *An alternative that is more hazardous is not a viable alternative.*" (Emphasis added.) The plaintiff excepted to the italicized sentence of the charge as removing from the patient the decision of which alternative procedure was the least dangerous. The same charge was repeated in response to a request of the jury, after they commenced deliberations, for a further definition of the standard of care. Again the plaintiff excepted to that part of the instructions.

We have not had previous occasion to consider substantively[2] the doctrine of informed consent as a basis for malpractice liability of a physician. In some of our cases, where the claim against the physician was contractual in nature, we have recognized the importance of informing the patient of certain aspects of the contemplated treatment or surgical procedure. See *Giambozi* v. *Peters,* 127 Conn. 380, 385, 16 A.2d 833 (1940); *Britton* v. *Hartshorn,* 113 Conn. 484, 488, 156 A. 48 (1931). We have approved the principle that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body; and

procedure. And this duty also includes a duty of a physician to advise of feasible alternatives. Now, the duty to warn of alternatives exists only when there are feasible alternatives available. An alternative that is more hazardous is not a viable alternative. The burden is on the plaintiff to show not only an unjustified failure to disclose the risk of a proposed procedure, but also that such failure was the proximate cause of the plaintiff's injury."

[2] In *Keenan* v. *Yale New Haven Hospital,* 167 Conn. 284, 285, 355 A.2d 253 (1974), we held that an amendment to a malpractice complaint stating that a physician had "assaulted the plaintiff by performing a surgical operation on him without securing his *informed consent*" stated a cause of action separate and distinct from the negligence originally pleaded, did not relate back to the date of commencement of the action and was, therefore, barred by the applicable statute of limitations, General Statutes § 52-584. (Emphasis added.)

a surgeon who performs an operation without his patient's consent, commits an assault, for which he is liable in damages." *Schmeltz* v. *Tracy,* 119 Conn. 492, 495–96, 177 A. 520 (1935), quoting Cardozo, J., in *Schloendorff* v. *New York Hospital,* 211 N.Y. 125, 129–30, 105 N.E. 92 (1914), overruled on other grounds, *Bing* v. *Thunig,* 2 N.Y.2d 656, 143 N.E.2d 3 (1957). "[I]f the lack of consent was established, the removal of the moles was in itself a trespass and had the legal result of an assault." *Schmeltz* v. *Tracy,* supra, 495.

The theory of battery as a basis for recovery against a physician has generally been limited to situations where he fails to obtain any consent to the particular treatment or performs a different procedure from the one for which consent has been given, or where he realizes that the patient does not understand what the operation entails. *Cobbs* v. *Grant,* 8 Cal. 3d 229, 240, 502 P.2d 1 (1972); 4 Restatement (Second), Torts § 892B, comment i; note, "Informed Dissent: A New Corollary to the Informed Consent Doctrine?" 57 Chi.-Kent L. Rev. 1119, 1122 n.18 (1981). The failure to make a sufficient disclosure, which is ordinarily the basis for claiming lack of informed consent, has been regarded by most courts as presenting the question, not whether there was an effective consent which would preclude an action for battery, but whether the physician had fulfilled his duty of informing the patient under the appropriate standard. *Cobbs* v. *Grant,* supra, 241; *Natanson* v. *Kline,* 186 Kan. 393, 402, 350 P.2d 1093, reh. denied, 187 Kan. 186, 354 P.2d 670 (1960); *Wilkinson* v. *Vesey,* 110 R.I. 606, 621, 295 A.2d 676 (1972); 4 Restatement (Second), Torts § 892B, comment i. Traditionally, the standard was deemed to be one set by the medical profession in terms of customary medical practice in the community. See, e.g., *DiFilippo* v. *Preston,* 53 Del. 539, 549–50, 173 A.2d 333 (1961);

*Haggerty* v. *McCarthy,* 344 Mass. 136, 141, 181 N.E.2d 562 (1962); *Roberts* v. *Young,* 369 Mich. 133, 140, 119 N.W.2d 627 (1963); *Aiken* v. *Clary,* 396 S.W.2d 668, 675–76 (Mo. 1965). As in other aspects of medical science, only members of the profession are ordinarily familiar with the standard and deemed qualified to testify about it. See, e.g., *Shetter* v. *Rochelle,* 2 Ariz. App. 358, 409 P.2d 74 (1965); *DiFilippo* v. *Preston,* supra; *Ditlow* v. *Kaplan,* 181 So. 2d 226 (Fla. App. 1965); *Nishi* v. *Hartwell,* 473 P.2d 116, 121 (Hawaii 1970); *Grosjean* v. *Spencer,* 258 Iowa 685, 140 N.W.2d 139 (1966); *Roberts* v. *Young,* supra; *Aiken* v. *Clary,* supra; *Petterson* v. *Lynch,* 59 Misc. 2d 469, 299 N.Y.S.2d 244 (1969); *Anderson* v. *Hooker,* 420 S.W.2d 235 (Tex. Civ. App. 1967); *Govin* v. *Hunter,* 374 P.2d 421 (Wyo. 1962).

The incongruity of making the medical profession the sole arbiter of what information was necessary for an informed decision to be made by a patient concerning his own physical well-being has led to various judicial and legislative attempts within the last decade to define a standard tailored to the needs of the patient but not unreasonably burdensome upon the physician or wholly dispensing with the notion that "doctor knows best" in some situations. While the essential ambivalence between the right of the patient to make a knowledgeable choice and the duty of the doctor to prescribe the treatment his professional judgment deems best for the patient has not been fully resolved, the outline has begun to emerge.

In a trilogy of cases decided in 1972 the traditional standard of customary medical practice in the community was abandoned by three jurisdictions as the criterion for informed consent in favor of a judicially imposed standard designed to provide a patient with information material to his decision upon a course of

therapy. *Canterbury* v. *Spence*, 464 F.2d 772 (D.C. Cir.) cert. denied, 409 U.S. 1064, 93 S. Ct. 560, 34 L. Ed. 2d 518 (1972); *Cobbs* v. *Grant*, supra; *Wilkinson* v. *Vesey*, supra. The formulations of the disclosure standard in these cases vary. "Thus the test for determining whether a particular peril must be divulged is its materiality to the patient's decision: all risks potentially affecting the decision must be unmasked." *Canterbury* v. *Spence*, supra, 786–87. "The scope of the physician's communications to the patient, then, must be measured by the patient's need, and that need is whatever information is material to the decision." *Cobbs* v. *Grant*, supra, 245. "It is our belief that, in due deference to the patient's right to self determination, a physician is bound to disclose all the known material risks peculiar to the proposed procedure." *Wilkinson* v. *Vesey*, supra, 627. These decisions require something less than a full disclosure of all information which may have some bearing, however remote, upon the patient's decision. *Canterbury* v. *Spence*, supra, 786. Although the test is phrased in terms of the "patient's need," rather than impose on the physician an obligation to disclose at his peril whatever the particular patient might deem material to his choice, most courts have attempted to frame a less subjective measure of the physician's duty. "[N]o less than any other aspect of negligence, the issue on nondisclosure must be approached from the viewpoint of the reasonableness of the physician's divulgence in terms of what he knows or should know to be the patient's informational needs." *Canterbury* v. *Spence*, supra, 787. "Materiality may be said to be the significance a reasonable person, in what the physician knows or should know is his patient's position, would attach to the disclosed risk or risks in deciding whether to submit or not to submit to surgery or treatment." *Wilkinson* v. *Vesey*, supra, 627; Waltz & Scheuneman, "Informed Consent to Therapy," 64 Nw. U.L. Rev.

628, 640 (1970). In states which have legislated this so-called "lay" standard of disclosure vis-a-vis the orthodox professional standard, the statutes typically impose a duty to disclose such information as a "reasonable patient would consider material to the decision whether or not to undergo treatment or diagnosis." See Pa. Stat. Ann. tit. 40, § 1301.103 (Purdon Cum. Sup. 1983); accord R.I. Gen. Laws § 9-19-32 (Cum. Sup. 1982); Wash. Rev. Code Ann. § 7.70.050 (1) (a) (Sup. 1983).

The standard has been further delineated by specifying various elements which the physician's disclosure should include: "(1) the 'nature' of the procedure, (2) the 'risks' and 'hazards' of the procedure, (3) the 'alternatives' to the procedure, and (4) the anticipated 'benefits' of the procedure." Meisel & Kabnick, "Informed Consent to Medical Treatment: An Analysis of Recent Legislation," 41 U. Pitt. L. Rev. 407, 427 (1980); *Canterbury* v. *Spence,* supra, 787–88. "Obviously there is no need to disclose risks that are likely to be known by the average patient or that are in fact known to the patient usually because of a past experience with the procedure in question." *Wilkinson* v. *Vesey,* supra, 627; *Canterbury* v. *Spence,* supra, 788; *Cobbs* v. *Grant,* supra, 244. Some limited recognition has been given also to the therapeutic privilege of a physician to withhold information where disclosure might jeopardize a course of therapy. *Canterbury* v. *Spence,* supra, 789; *Cobbs* v. *Grant,* supra, 246.

The leading case of *Canterbury* v. *Spence,* supra, was given a generally favorable reception by the judiciary, and soon the lay standard of disclosure had been adopted in eight states,[3] obligating the physician to provide the patient with that information which a reason-

---

[3] California, Louisiana, New York, Ohio, Pennsylvania, Rhode Island, Vermont and Washington.

able patient would have found material for making a decision whether to embark upon a contemplated course of therapy. Meisel & Kabnick, supra, 423. Three of these states subsequently have abandoned this standard by statutes which expressly or implicitly adopt the professional standard of disclosure in accordance with the practice of a reasonable medical practitioner under similar circumstances. See N.Y. Pub. Health Law § 2805-d (1) (McKinney 1977); Ohio Rev. Code Ann. § 2317.54 (Baldwin Sup. 1978); Vt. Stat. Ann. tit. 12, § 1909 (a) (1) (Cum. Sup. 1983); Meisel & Kabnick, supra, 425. Despite the possibility of legislative revision, we are persuaded that criticism of the professional standard as expounded in *Canterbury* is well-founded and we, therefore, shall follow the lay standard of disclosure.

This standard was the basis for the charge given by the trial court upon informed consent.[4] As we have noted, the plaintiff takes issue only with the single sentence of that charge which declares "[a]n alternative that is more hazardous is not a viable alternative." During the trial there was considerable testimony about the hazards of the needle biopsy, which had resulted in puncturing the plaintiff's gall bladder, as compared to an open biopsy requiring general anesthesia and a surgical incision. Philip Roen, a urologist called by the plaintiff, testified that the alternative of an open biopsy should have been discussed with the plaintiff with disclosure of the risks attending any surgical procedure conducted under general anesthesia. Three doctors presented by the defendants testified that an open renal biopsy was not a viable alternative to a needle biopsy. Another witness for the defendants, Malcolm Galen, a physician, testified that an open biopsy was more hazardous than a needle biopsy, but that he did inform

---

[4] See footnote 1, supra.

his patients that the alternative of an open biopsy was available with its attendant risks, though he advised against it. It was conceded that an open biopsy alternative was never discussed with the plaintiff who, with the benefit of hindsight, testified that she would have chosen that procedure if she had known of it.

The instruction that an alternative which is more hazardous is not viable and, therefore, need not be mentioned to the patient has the effect of limiting the physician's duty to disclosure of only the least hazardous procedure available, presumably the one contemplated. The issue then becomes, not whether the patient has been informed of viable alternatives, but whether the doctor has recommended the least dangerous of them, because those which are more hazardous need not be discussed. This instruction, therefore, wholly relieves physicians of any obligation to discuss alternatives with their patients and substitutes merely a duty to recommend the safest procedure. It is incompatible, therefore, with the view which the trial court expressed in the remainder of the charge that the patient must be provided with sufficient information to allow him to make an intelligent choice.

The defendants have not attempted to defend or to cite any authority in support of the proposition that if an alternative is more hazardous it need not be disclosed, although its source appears to have been one of their requests to charge.[5] They contend (1) that there was overwhelming evidence that an open kidney biopsy was not a viable alternative to a closed needle biopsy; (2) that, because of the plaintiff's previous education and employment as a medical assistant to a physician,

---

[5] The requests to charge of the defendants Bogdan and Newberg included this statement, citing the note at 88 A.L.R.3d 1044. We have examined that annotation, but are unable to find anything in support of the proposition in question.

she was far more sophisticated in medicine than most patients; and (3) that the questioned sentence of the charge did not sufficiently distort the total effect of the charge, which was otherwise favorable to the plaintiff, so as to be prejudicial. We disagree. The plaintiff did produce at least one doctor who testified that an open biopsy was a viable alternative and the jury could reasonably have believed him rather than the several experts who testified for the defendants. The jury could also have found that the plaintiff had insufficient medical knowledge to be aware of the open biopsy procedure as a viable alternative for her. It is true, of course, that "a charge to the jury is to be judged in its entirety and harmful error cannot be predicated on detached sentences or portions of the charge unless it is reasonably probable that the jury could have been misled by them." *Vandersluis* v. *Weil,* 176 Conn. 353, 360, 407 A.2d 982 (1978). Although we are reluctant to find reversible error because of a single sentence of a lengthy charge, we are unable to avoid the conclusion that the error was probably harmful. The major focus of the testimony on the issue of informed consent was the relative hazard involved in each of the two medical procedures. In advising the jury that more hazardous alternatives were not viable and could be withheld from the patient, the trial court invited them to decide the issue of informed consent simply by comparing the risks of the two procedures. The jury could well have understood that, if they concluded that an open biopsy was more hazardous than the needle biopsy performed, there was no duty to inform the plaintiff of that alternative. Such a misunderstanding would have been wholly inconsistent with the view we have adopted requiring that all viable alternatives be disclosed even though some involve more hazard than others.

## II

The remaining claims of error in the charge relate to the instructions upon (1) evaluating the opinions of expert witnesses, (2) the application of the legal principles to the evidence, (3) the liability of a physician for "a bona fide error in judgment," and (4) the extent of the area to be considered in determining the applicable standard of care.

### A

The trial court charged that, in evaluating the answers given by expert witnesses to hypothetical questions in which certain facts are assumed, the weight of the expert opinion would depend upon whether the postulated facts had actually been proved. In excepting to the charge, the plaintiff conceded the accuracy of this instruction but requested a further instruction that the jury should also consider the sufficiency of the facts assumed in the hypothetical question in weighing the opinion. The court did not make the suggested revision of the charge.

We have approved a jury instruction upon the evaluation of expert testimony which directs attention both to the omission of material facts from a hypothetical question as well as the evidentiary basis for the facts assumed. *Pischitto* v. *Waldron,* 147 Conn. 171, 176, 158 A.2d 168 (1960). Although the trial court should have amplified this portion of the charge in accordance with the plaintiff's exception, we are not persuaded that the failure to do so was substantially harmful. *Matthews* v. *F.M.C. Corporation,* 190 Conn. 700, 705, 462 A.2d 376 (1983); *Siladi* v. *McNamara,* 164 Conn. 510, 515, 325 A.2d 277 (1973); *Amato* v. *Desenti,* 117 Conn. 612, 617, 169 A. 611 (1933).

## B

The plaintiff's claim that the charge made insufficient reference to the evidence to serve as an adequate guide to the jury is not supported by our review. In part the plaintiff relies upon the failure of the court to grant approximately ten pages of her voluminous request to charge which summarize the evidence presented from her understandably partisan viewpoint. The charge was more than a bare statement of the applicable legal principles and did include a detailed explanation of the pleadings with various references to the evidence. See Practice Book § 318. The claims of negligence were discussed with specific reference to the defendants to whom they related.

The plaintiff claims there should have been a further "marshaling" of the evidence in response to several notes submitted by the jury during their deliberations. These inquiries consisted of requests for the definition of certain words, for the testimony of some witnesses, and, as construed by the court, for another reading of the charge upon the standard of care. Compliance with the plaintiff's demand under these circumstances would have been inappropriate.

"The degree to which reference to the evidence may be called for lies largely in the discretion of the court." *Gorham* v. *Farmington Motor Inn, Inc.*, 159 Conn. 576, 583, 271 A.2d 94 (1970); accord *State* v. *Stepney,* 191 Conn. 233, 464 A.2d 758 (1983). We conclude that the charge was not so deficient in this respect that it failed to serve as an adequate guide to the jury. *Vita* v. *McLaughlin,* 158 Conn. 75, 77, 225 A.2d 848 (1969); *Corrievau* v. *Associated Realty Corporation,* 122 Conn. 253, 256–57, 188 A. 436 (1936).

## C

In response to an exception, taken by counsel for the defendant Bogdan, that a portion of his request to charge had been omitted, the court corrected the initial charge as follows: "The part I left out is that he is not liable for a bona fide error in judgment provided he concludes, as best he can, and does what he thinks best, after a careful examination, and acts in good faith subject to the rule of care, skill and diligence such as I have defined it to you."[6] The plaintiff had objected before the recharge that the omitted portion of the request relating to bona fide error was a mere "appendage," that the initial charge had covered the subject adequately, and that a further charge upon the matter would unfairly emphasize that aspect of the case. Neither at that time nor in her exception after the corrected charge had been given did the plaintiff claim, as she does on this appeal, that the instruction relating to a "bona fide error in judgment" was an incorrect statement of the law.

The apparent source of the challenged language was a passage in *Green* v. *Stone,* 121 Conn. 324, 330, 185 A. 72 (1936), as follows: "The plaintiff complains of the failure of the court to charge in the language of this request and of its statement in a single sentence of the charge that a doctor is not liable for a bona fide error

---

[6] This portion of the charge was as follows:"The Court: The part I left out is that he is not liable for a bona fide error in judgment provided he concludes, as best he can, and does what he thinks best, after a careful examination, and acts in good faith subject to the rule of care, skill and diligence such as I have defined it to you. If he exercises reasonable care, skill and diligence the fact that a result has not been as favorable as hoped for by the plaintiff or the physicians themselves raises no presumption of want of proper care or skill. In other words, if the physicians use skill, care and diligence they are not to be held liable if a bad result occurs. Failure in a procedure, bad results or injuries, as in this case, does not by itself raise any presumption of such want of skill or care."

in judgment, and says that the jury may well have obtained the impression from the charge that the defendant could under no circumstances be held responsible for an error of judgment so long as it was bona fide. The court repeatedly charged the jury that it was the duty of the defendant to exercise the care and skill required of a specialist in the field of obstetrics, and the charge made it abundantly clear that he would be absolved from a bona fide error in judgment only in case he exercised such care and skill." We do not construe *Green* as approving the reference to "a bona fide error in judgment," but as concluding that it did not sufficiently distort the general purport of the charge to constitute reversible error. A similar charge was also sustained in *Levett* v. *Etkind,* 158 Conn. 567, 576, 265 A.2d 70 (1969), although it is not clear that the portion pertaining to a "bona fide error in judgment" was under attack. We agree with the plaintiff, nevertheless, that to use such a phrase in a charge upon negligence serves only to confuse a jury by implying that only an error in judgment made in bad faith can be actionable. The central issue in the ordinary negligence case is whether the defendant has deviated from the required standard of reasonable care, not his mental state at the time of the conduct which constitutes the deviation. "Negligence is conduct which creates an undue risk of harm to others." 2 Restatement (Second), Torts § 463, comment b; *Hoelter* v. *Mohawk Service, Inc.,* 170 Conn. 495, 501, 365 A.2d 1064 (1976). Errors in judgment which occur with the best intentions constitute negligence if they result from a failure to use reasonable care.

We need not decide whether the allusion to non-liability of a physician for a bona fide error in judgment was sufficiently confusing in the context of the whole charge to create the likelihood of a misunderstanding

on the part of the jury. See *Green* v. *Stone,* supra, 330. As we have indicated, the ground for the plaintiff's present attack on this portion of the charge was not included in the exception taken in the trial court. See Practice Book § 315. We are not bound to consider a claim unless it was "distinctly raised at the trial . . . ." Practice Book § 3063. The plaintiff, therefore, cannot prevail upon this ground which was first raised on appeal.

## D

The plaintiff's final claim of error with respect to the charge is that the court instructed the jury that the applicable standard of conduct was the standard of practice of doctors in the same specialties practicing in the state of Connecticut.[7] The plaintiff excepted to this geographical limitation of the applicable standard as being arbitrary.

In *Geraty* v. *Kaufman,* 115 Conn. 563, 574, 162 A.2d 33 (1932), we rejected the notion that a physician was obliged to exercise only that degree of skill possessed by other practitioners in the community in which he lived and held that testimony of the general practice in this state concerning the particular medical procedure involved was properly admitted. "There is now no lack of opportunity for the physician or surgeon in smaller communities to keep abreast of the advances made in his profession, and to be familiar with the latest methods and practices adopted." Id. We reaffirmed the view that "the general neighborhood is the entire state

---

[7] In the initial charge the court referred to the "standard of practice of doctors in the same specialties practicing in the same general neighborhood," leaving the determination of what constituted the general neighborhood to the jury. After an exception, in which counsel for one of the defendants cited *Katsetos* v. *Nolan,* 170 Conn. 637, 646, 368 A.2d 172 (1976), the court recharged that the general neighborhood was the entire state of Connecticut.

of Connecticut" in *Fitzmaurice* v. *Flynn,* 167 Conn. 609, 617, 356 A.2d 887 (1975). There we recognized that "there may exist reason to disregard territorial limitations even with regard to state boundaries," but found no need then to decide that question. Id. We also limited our definition of the general neighborhood to the boundaries of this state in *Katsetos* v. *Nolan,* 170 Conn. 637, 646, 368 A.2d 172 (1976), again finding no necessity to decide whether that restriction should be expanded.

In the present case no evidence was offered of standards of practice for any of the specialties involved different from those prevailing in this state. The plaintiff's expert witness, Philip Roen, practiced urology in New York City and had taught at medical colleges in that city. He testified that the standard of care for the performance of a renal biopsy was the same throughout the United States. He was permitted to testify fully as to the applicable standard both for performance of such biopsies and for obtaining informed consent thereto. A physician, Arthur Tessler, called by one of the defendants, also testified that the standard of care for performance of a closed renal biopsy was the same in New York, where he practiced as a urologist, as in Connecticut. In view of this testimony we are not persuaded that the plaintiff was harmed by the limitation of the standard of care to medical practice within this state.

We must, nevertheless, face the issue since it may well arise upon the retrial of the issue of informed consent which we have ordered. We think the time has come to broaden the geographical limitation we have previously imposed to include the entire nation. Under contemporary conditions there is little reason to retain this vestige of former times when there was a substantial basis for believing "that the rural doctor should not be held to the standards of the urban doctor, since the

latter had greater access to new theories and had more opportunity to refine his method of practice." *Fitzmaurice* v. *Flynn,* supra, 617. We are not aware of any differences in the educational background and training of physicians practicing in Connecticut compared with those in other states. Medical literature of significance is normally disseminated throughout this country and not confined to a particular state. We align ourselves with many other jurisdictions which have in recent years abandoned similar geographical restrictions in medical malpractice cases. *May* v. *Moore,* 424 So. 2d 596, 601 (Ala. 1982); *Fain* v. *Moore,* 155 Ga. App. 209, 270 S.E.2d 375 (1980); *Speed* v. *State,* 240 N.W.2d 901, 908 (Iowa 1976); *Blair* v. *Eblen,* 461 S.W.2d 370, 372–73 (Ky. 1970); *Shilkret* v. *Annapolis Emergency Hospital Assn.,* 276 Md. 187, 200–201, 349 A.2d 245 (1975); *Brune* v. *Belinkoff,* 354 Mass. 102, 109, 235 N.E.2d 793 (1968); *Pharmaseal Laboratories, Inc.* v. *Goffe,* 90 N.M. 753, 758, 568 P.2d 589 (1977); *King* v. *Williams,* 279 S.E.2d 618, 620 (S.C. 1981); *Pederson* v. *Dumouchel,* 72 Wash. 2d 73, 79, 431 P.2d 973 (1967); *Shier* v. *Freedman,* 58 Wis. 2d 269, 283–84, 206 N.W.2d 166 (1973).

### III

We must next consider the plaintiff's claim that the court erred in directing verdicts for the defendant Forbes Delany, the radiologist who participated in the operation, and the defendant hospital. It is undisputed that Delany's role was to operate the fluoroscopic equipment in order to enable Bogdan, the urologist performing the operation, to see the plaintiff's kidney and the needle used to accomplish the biopsy. Because it was impossible to manipulate the biopsy needle while the fluoroscopic screen was in a position to provide visualization, the device had to be moved in and out of that position during the course of the procedure at

the request of the operating surgeon. Delany's function was to respond to these requests by controlling the movement of the screen through the use of the related machinery. There is no evidence that he did not perform this task properly and in accordance with the appropriate standard for his specialty. He played no part in discussing the procedure with the plaintiff and there was no evidence that his duty as a radiologist required his participation in obtaining her informed consent. None of the specifications of negligence,[8] which are addressed indiscriminately to the three physician defendants, Newberg, Bogdan and Delany, pertains to the performance of the duty of a radiologist as established by the evidence in this case. The court properly directed a verdict in favor of the defendant Delany.

---

[8] The second count of the complaint, which was addressed to the individual physician defendants, contained the following paragraphs:

"26. The injuries and damages suffered by the plaintiff as hereinbefore stated were caused by the negligence and lack of skill and care of the defendants Peter Bogdan, Forbes Delany and Marc E. Newberg:

"a. In that they failed to obtain the plaintiff's intelligent and informed consent to the performance of a percutaneous renal biopsy;

"b. In that they failed to accurately determine the location, size, configuration and stability of the plaintiff's right kidney before attempting the needle biopsy;

"c. In that they failed to accurately examine and analyze the specimen from the biopsy needle after the first attempt to determine whether or not kidney tissue was obtained;

"d. In that during the biopsy procedure they failed to determine the location, size, configuration and stability of the plaintiff's right kidney in relation to the biopsy needle;

"e. In that they failed to allow for the effect of the plaintiff's respiration on the location and stability of the plaintiff's right kidney during the biopsy procedure;

"f. In that they failed to accurately examine and analyze the specimen from the second biopsy attempt to determine the nature of the tissue obtained; and

"g. In that they performed upon the plaintiff a percutaneous needle biopsy to obtain a specimen of kidney tissue, which procedure in itself constitutes a violation of the required standard of care."

With respect to the defendant hospital, the claim of liability predicated upon the alleged negligence of the defendant Delany as an employee acting within the scope of his employment must fall with our disposition of the claim against him personally. There was no evidence which would justify submission of the remaining allegations of corporate negligence[9] to the jury. No testimony was presented to indicate that reasonably prudent hospital practice imposed any duty upon this defendant to supervise the physicians who participated in the operation in any of the respects claimed. We find no error in the direction of a verdict for the defendant hospital.

## IV

We are also convinced that the trial court should have granted the motion of the defendant Newberg for a directed verdict. Since he did not participate in the kidney biopsy operation, the claims of negligence in the performance of that operation were inapplicable to him. The trial court recognized that there was no evidence that he was involved in conducting the surgical proce-

[9] The first count of the complaint, which was directed only to the defendant hospital, contained the following paragraphs:

"25. The injuries and damages suffered by the plaintiff as hereinbefore stated were caused by the negligence and lack of skill and care of the defendant Greenwich Hospital Association, acting through its agent and employee the defendant Forbes Delany, M.D. as more particularly described hereinafter, and such corporate defendant was further negligent:

"a. In that it failed to reasonably require the use of fluoroscopic visualization during the performance of the percutaneous needle biopsy;

"b. In that it failed to require the analysis of the results of the percutaneous needle biopsy within a reasonable time after its completion;

"c. In that it approved of and permitted the performance of a percutaneous needle biopsy to obtain a specimen of the kidney tissue, which procedure, in and of itself, constituted a violation of the required standard of care;

"d. In that it failed to obtain the plaintiff's intelligent and informed consent to the performance of a percutaneous renal biopsy."

dure and, therefore, limited the basis for holding him liable to the allegation of failure to obtain an informed consent.

Although it is undisputed that Newberg did discuss the kidney biopsy with the plaintiff and describe the procedure generally, there was no evidence that it was his duty to do so. In fact, the testimony indicated the contrary. The plaintiff's expert witness, Philip Roen, testified that an internist, such as Newberg, had no obligation to discuss the surgical procedure with the plaintiff or to obtain her informed consent. He stated unequivocally that those duties rested upon the physician who was to perform the operation. The defendant Bogdan testified to the same effect and also said that in fulfilling his responsibility to obtain an informed consent he had not relied upon any discussion Newberg may have had with the plaintiff.

The principle that one who gratuitously undertakes a service which he has no duty to perform must act with reasonable care in completing the task assumed is not applicable to this situation. See *Zatkin* v. *Katz,* 126 Conn. 445, 450, 11 A.2d 843 (1940); Prosser, Torts (4th Ed. 1971) § 56, pp. 338–48. Although Newberg did describe the general nature of the operation to the plaintiff and some of the possible complications, he also told her that a more detailed explanation would be provided by Bogdan, the urologist. There is no evidence that his reliance upon the operating surgeon to provide the information necessary for informed consent was contrary to normal medical practice or was unreasonable under these particular circumstances. With respect to the failure to discuss the open biopsy alternative, which is the single omission claimed by the plaintiff in the explanation given, it would have been presumptuous for Newberg, an internist, to suggest a surgical procedure in the field of urology other than that which

Bogdan, a qualified specialist in that area of medicine, had recommended and thus possibly undermine the confidence the plaintiff should have in her surgeon. We hold that under the circumstances of this case Newberg, as the referring physician, had no obligation to inform the plaintiff of viable alternative procedures but might reasonably have relied upon Bogdan, the specialist, to provide such information. We shall not, therefore, disturb the verdict in favor of Newberg.

## V

The plaintiff's final claim of error is that the court failed to inquire of the jury whether the verdict rendered was one upon which they had unanimously agreed. When the jury returned to the courtroom they were asked whether a verdict had been reached. The foreman responded affirmatively and, as directed by the court, he handed the written verdict forms to the sheriff, who gave them to the court. The forms were returned to the foreman for insertion of the date. The jury roll was called and the clerk then read both the directed verdict for the hospital and the defendant Delany and also the verdict for the remaining defendants, which had resulted from the deliberations of the jury.

The court ordered the verdicts to be accepted and recorded. At this point the plaintiff sought that the jury be polled. Before any ruling on this request, the clerk asked the jury to "hearken" to their verdict as accepted and ordered to be recorded by the court and once again read both verdicts. Before the jury responded the plaintiff demanded that the jury be polled individually. The court inquired whether the plaintiff was seeking an individual poll. After the plaintiff had responded in the affirmative, the court denied the motion, the plaintiff excepted and the jury was discharged.

We have had recent occasion in criminal cases to deal with the situation where the clerk's inquiry as to the unanimity of the verdict has been interrupted by counsel or the court, leaving the transcript devoid of any express assent by the other jurors to the verdict as announced by the foreman. *State* v. *Martin,* 189 Conn. 1, 5 n.1, 454 A.2d 256 (1983); *State* v. *Avcollie,* 174 Conn. 100, 106, 384 A.2d 315 (1977). We have held that this deficiency is not a defect of such magnitude as to invalidate the verdict. "[I]t is to be presumed that the jury assent to a verdict rendered in their presence and hearing." *Raymond* v. *Bell,* 18 Conn. 81, 90 (1846). "The procedure followed, while not in compliance with the preferred, established form commonly adhered to, provided adequate safeguards to ensure a common understanding of the verdict: the verdict was rendered in open court by the foreman in the presence of the entire jury, the court, and counsel." *State* v. *Avcollie,* supra, 106.

We see no reason to demand stricter compliance with the standard procedure for delivering and recording a jury verdict in a civil case, where there is the additional safeguard of a written form signed by the foreman. Particularly where a party has caused the interruption of the normal procedure, as in this case where the request for an individual poll was made by counsel for the plaintiff before the jury had answered the clerk's inquiry, he cannot claim error in the failure of the transcript to reflect that response. "By interrupting the established procedure for acceptance of the verdict, the defendant effectively waived compliance with that procedure." *State* v. *Avcollie,* supra, 106.

With respect to the request for an individual poll of the jury, we have frequently held that the denial of such a motion is discretionary. *State* v. *Avcollie,* 188 Conn.

626, 644, 453 A.2d 418 (1982) cert. denied, 461 U.S. 928, 103 S. Ct. 2088, 77 L. Ed. 2d 299 (1983); *State* v. *Tucker,* 181 Conn. 406, 420, 435 A.2d 986 (1980); *State* v. *Hoyt,* 47 Conn. 518, 533 (1880). We are not persuaded that any change in this view is warranted, especially in a civil case.

## VI

In summary, we have found reversible error only in the portion of the jury charge stating that a physician need not discuss with a patient any alternative which is more hazardous than the treatment he has recommended. That error infects only the theory of the complaint based upon a failure to obtain an informed consent. The necessity for a new trial, therefore, is limited to that issue and to the defendant Bogdan, whose sole duty it was to provide the requisite information to the plaintiff. "If several issues are presented by the pleadings and, on the trial of one or more of such issues, an error or ground for a new trial intervenes which does not affect the legality of the trial or disposition of the other issue or issues, judgment shall not be arrested or reversed, nor a new trial granted, except so far as relates to the particular issue or issues in the trial of which such error or ground for a new trial intervened." General Statutes § 52-266; see *Wendland* v. *Ridgefield Construction Services, Inc.,* 190 Conn. 791, 795, 462 A.2d 1043 (1983). We have previously applied this principle in a malpractice case where the complaint set forth two theories of liability. *Giambozi* v. *Peters,* 127 Conn. 380, 387, 16 A.2d 833 (1940).

The defendants Newberg and Bogdan have included in their briefs a "counterstatement of issues," claiming essentially that the general verdict doctrine is applicable to this case because the jury may have concluded that the various complications which the plain-

tiff suffered after the kidney biopsy operation were not causally related thereto. The defendants have failed to follow Practice Book § 3012 (a), which requires an appellee to file a preliminary statement of issues where he "wishes to present for review alternate grounds upon which the judgment may be affirmed . . . ." We have not previously insisted upon compliance with that provision, however, where the general verdict rule is clearly applicable. *Batick* v. *Seymour,* 186 Conn. 632, 639, 443 A.2d 471 (1982). Here, the claim that the jury's verdict may have been based wholly on a finding that no damages were proved by the plaintiff borders on the frivolous. It was virtually undisputed that her gall bladder was punctured during the biopsy and had to be removed. Furthermore, we have never extended the doctrine to a verdict for a defendant which might possibly rest upon a determination of the damages issue against a plaintiff nor are we inclined to do so.

There is error in the resolution of the claim against the defendant Bogdan for his alleged failure to obtain the informed consent of the plaintiff; that judgment is set aside and the case is remanded for a new trial of that issue as well as the related question of damages against the defendant Bogdan; there is no error with respect to the other issues or the other defendants.

In this opinion the other judges concurred.