Frederick PARKINS, et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. B–88–354 (WWE).

United States District Court, D. Connecticut.

Aug. 25, 1993.

---

*MEMORANDUM OF DECISION*

EGINTON, Senior District Judge.

Helen Parkins brings this action individually and as Executrix of the estate of her deceased husband, Frederick Parkins, under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* The Amended Complaint alleges that because of the negligence of the doctors at the Veterans Administration Medical Center ("VAMC") in West Haven, Connecticut, Mr. Parkins became paralyzed and eventually died and Mrs. Parkins was deprived of the care, support, companionship and consortium of her husband. Plaintiffs seek lost wages, expenses for various equipment and home renovations that were necessary to make the Parkins' home accessible to wheelchairs and to help Mr. Parkins be as self-sufficient as possible, funeral expenses, and pain and suffering. After five days of trial, the court enters the following Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a).

*Findings of Fact*

In February, 1982, Frederick Parkins, a World War II veteran, was tested for a suspected abdominal aortic aneurysm at Yale–New Haven Hospital. The radiological tests disclosed diffuse ectasia of the thoraco-abdominal segment of the aorta from the highest point of it that could be visualized, in the area of the tenth thoracic vertebra, down through the first lumbar vertebra. At that point, the aorta narrowed and then, farther down, enlarged into an aneurysm measuring approximately 6 cm. On March 22, 1982, Mr. Parkins underwent abdominal surgery to address his aneurysm. Dr. Kreis and Dr. Tilson, then chief of vascular surgery at Yale–New Haven Hospital, performed the surgery.

During the surgery, Dr. Kreis and Dr. Tilson discovered that the aneurysm actually measured 7 cm. and extended to the level of the renal arteries, where it measured 3.5 cm. Because the aneurysm implicated the renal arteries, the doctors determined that it was not resectable. It was therefore left in place and patched. In 1982, vascular surgeons in the United States had little experience in operating on the aorta above the renal arteries to repair aortic aneurysms. Such operations involve enhanced risks for the patient over procedures confined below the renal arteries. It was therefore the practice of vascular surgeons to avoid extending the procedure above the renal arteries. In such cases, the doctors chose to wrap or patch the area of the aneurysm rather than to resect it. This technique has since been abandoned.

In November, 1985, during a regularly scheduled examination at the hypertension clinic at the VAMC, physical examination of Mr. Parkins disclosed possible enlargement of the aneurysm which had been the subject of the 1982 procedure. Ultrasound studies conducted on November 1, 1985, showed that Mr. Parkins' aneurysm had increased in size to approximately 8 cm. Dr. Richard Cambria reviewed Mr. Parkins' chart and history and, on November 11, 1985, ordered a CAT scan, angiography and several consults, contemplating admission of Mr. Parkins for treatment of his aneurysm.

On December 3, 1985, after reviewing the CAT scans, Dr. Cambria noted that Mr. Parkins appeared to have a dumbbell-shaped thoracoabdominal aneurysm, since there was a small, relatively normal aortic segment in

between each lobe of the aneurysm. He noted further that the aorta was aneurysmal at the region of the renal arteries and had previously been dissected by Dr. Tilson. He concluded that, due to the suspected condition and location of the aneurysm, and the previous procedure, he would use a thoracoabdominal surgical approach.

Although the precise nature of the surgical repair needed to address Mr. Parkins' condition would depend upon direct observation of the patient and his condition in the operating room, the condition of the aorta in the area of the renal arteries was such that, for the purpose of the required aortic repair, the aorta would have to be clamped above the renal arteries in the area of the mid- to lower thoracic aorta, where the tissue of the aorta was healthy. The risk of clamping below this area was that the clamp could tear the abnormal aortic tissue, and lead to the patient's death. Suturing into abnormal tissue in this area would involve a similar risk, and locating healthy aortic tissue into which to anchor sutures could only be accomplished by direct observation in the operating room.

Because of the location of portions of the aneurysmal tissue at or above the renal arteries, the condition reflected in the preoperative studies of Mr. Parkins was a Type IV thoracoabdominal aortic aneurysm. Dr. Cambria determined that the procedure required to repair Mr. Parkins' aorta was a thoracoabdominal surgical approach with clamping of the thoracic aorta. The other options available would have been no surgery or to try to repair the lower portion of the aneurysm—the lobe of the aneurysm located in the abdomen.

The risks associated with the procedure chosen by Dr. Cambria include bleeding, infection, heart attack, kidney failure, intestinal clotting, spinal cord injury, paralysis, and death. Specifically, thoracoabdominal aortic aneurysm surgery on a Type IV thoracoabdominal aortic aneurysm carries with it a 3% risk of death and a 7–10% risk of paralysis of the lower limbs. The risks of kidney failure and lower limb paralysis arise from clamping of the aorta above the blood supply to these · parts of the body. Inadvertent injury to the

spinal cord during such a procedure cannot be predicted or prevented.

Without surgery, Mr. Parkins faced a risk of approximately 20% per year of rupture of the abdominal portion of his aneurysm leading to death. Studies conducted at the Mayo Clinic show that 76% of patients with thoracoabdominal aortic aneurysms die within two years of detection of the disease. Repairing only the lower portion of Mr. Parkins' aneurysm would significantly decrease the risk of paralysis, but would increase the risk of death, since the clamp and sutures necessarily would be placed on unhealthy tissue, which could easily tear during or after surgery, causing hemorrhaging and death. Apparently because thoracoabdominal surgery was the safest option, Dr. Cambria did not discuss with Mr. Parkins the possibility of repairing only the abdominal portion of the aneurysm.

On December 6, 1985, Dr. August explained the material risks and alternatives of thoracoabdominal aortic resection to Mr. Parkins. At trial, Dr. August did not recall the exact risks discussed, but testified that significant risks of surgery are typically documented on consent forms. On December 8, 1985, at 9:45 a.m., Mr. Parkins signed a consent form which stated that the operation to be performed was a resection of the abdominal aortic aneurysm with a thoracoabdominal approach. The consent form listed hemorrhage, infection, and renal failure as the risks of surgery explained to Mr. Parkins. Although paralysis was a significant risk of the surgery performed, the form Mr. Parkins signed did not list paralysis as a risk.

On the evening of December 8, 1985, Dr. August again discussed some of the risks of the proposed surgery with Mr. Parkins, Mrs. Parkins, and several of their sons. At that time, Dr. August again explained that the proposed surgery involved placement of an aortic clamp to shut off the blood supply, and that this carried with it the risk of damage to parts of the body below the level at which the blood would be shut off. None of the family members present recalled being informed that paralysis was a risk of the surgery. Although Dr. Cambria testified that he informed Mr. Parkins of the risk of paralysis,

he could not remember when he explained this to Mr. Parkins.

Mrs. Parkins testified that if her husband had been informed that paralysis was a significant risk of the surgery he would have chosen to forego surgery. This is because Mr. Parkins was a very active person, both at work and at home, who believed he could not endure life in a wheelchair. Mr. Parkins' sons testified that hunting and fishing were an important part of their father's life and that walking was an essential part of his job. Mrs. Parkins testified that her husband told her that, "If I was told that I was going to be paralyzed, I would have put my pants on and walked out of the hospital."

On December 9, 1985, employing a thoracoabdominal approach, Dr. Cambria operated on Mr. Parkins. The findings in the course of the surgery disclosed a large abdominal aneurysm, aneurysmal aorta at the level of the left renal artery, and weakened aneurysmal aorta above this level extending to the diaphragm. The thoracic aorta was clamped, the thoracoabdominal aneurysm was opened and a dacron prosthesis was sutured into place. From a technical standpoint, the procedure performed by Dr. Cambria was carried out appropriately and within the applicable standard of care.

However, after the surgery, Mr. Parkins was paralyzed from the chest down. He was transferred to the VA Hospital in Bronx, NY, where he received therapy, and he and Mrs. Parkins were instructed in his care. After a stay at that facility, Mr. Parkins returned home in late summer of 1986.

Mrs. Parkins was specifically instructed at the Bronx VA Hospital regarding the importance of keeping Mr. Parkins clean, and was instructed as to the relation between his cleanliness and prevention of skin breakdowns and infection. While at home, Mr. Parkins bathed three times a week, and otherwise cleaned himself with a basin and cloth; as he was unable to reach his legs, Mrs. Parkins helped him clean this part of his body. Nevertheless, Mr. Parkins' skin was moist from sweat most of the time.

Over the course of his home stay, Mr. Parkins attended regularly scheduled examinations at the West Haven VAMC hypertension clinic. In January of 1989, severe weather conditions prevented Mr. Parkins from attending his scheduled examination at the clinic, and the examination was rescheduled for February. Weather conditions again caused him to miss his February appointment. That February, Mr. Parkins contracted what appeared to be a cold or flu. He developed a skin rash over the backs of his legs, and became disoriented and unable to recognize close family members. Despite his deteriorating condition, Mr. Parkins resisted family suggestions that he be brought to the hospital and indicated that he desired to die at home.

On February 18, 1989, Mrs. Parkins discovered a skin lesion on Mr. Parkins' stomach. Two days later, against Mr. Parkins' wishes, Mrs. Parkins took her husband to the hospital. At the hospital, an additional lesion was discovered in Mr. Parkins' armpit. At the time of his admission, he was weak, dehydrated, and not verbally communicative. He had low body temperature, a rash over most of his body and lesions on his legs. He was diagnosed as having an advanced staphylococcus infection. Mr. Parkins died on February 28, 1989.

Staphylococcus bacteria is present on people's skin and can be controlled through normal hygiene. Because paraplegics have a difficult time cleaning themselves, they are prone to staphylococcus infections. Mr. Parkins became infected at home when the bacteria entered his body through bed sores and other lesions. These lesions, and the infection, were caused by a failure of Mr. Parkins to maintain normal hygiene. Dr. Traeger, plaintiffs' infectious disease expert, testified that Mr. Parkins' infection could have been treated with antibiotics and his death could have been avoided if he had been taken to the hospital sooner.

*Conclusions of Law*

A. *Informed Consent*

 Plaintiffs claim that Dr. Cambria was negligent because he failed to inform Frederick Parkins of all the treatment options available and failed to disclose the significant risk of paralysis associated with the

surgery contemplated and performed. To prevail on a claim based upon lack of informed consent, a plaintiff must show a duty to disclose material information regarding a proposed treatment; failure to disclose a material factor; and damage or injury caused by failure to disclose. *Mason v. Walsh,* 26 Conn.App. 225, 230, 600 A.2d 326 (1991), *app. denied,* 221 Conn. 909, 602 A.2d 9 (1992); *Hammer v. Mt. Sinai Hosp.,* 25 Conn.App. 702, 711, 596 A.2d 1318 (1991), *app. denied,* 220 Conn. 933, 599 A.2d 384 (1991). This duty to disclose material information includes a duty to inform the patient of all treatment options and all known material risks. Doctors do not fulfill this duty by presenting only the safest procedures available. They must disclose all the treatment options and the risks associated therewith in order to ensure that the patient has sufficient information to make an intelligent choice. *Logan v. Greenwich Hosp. Ass'n,* 191 Conn. 282, 294, 465 A.2d 294 (1983). In order to support a recovery, a plaintiff must make out a causal connection between the failure to disclose a material fact and the harm claimed. *Lambert v. Stovell,* 205 Conn. 1, 6, 529 A.2d 710 (1987). The test of causation to be applied is whether a reasonable person, suitably informed, would have decided differently than the plaintiff alleging lack of informed consent regarding the proposed treatment. *Hammer,* 25 Conn.App. at 711–12, 596 A.2d 1318; *see also, Shenefield v. Greenwich Hosp. Ass'n,* 10 Conn.App. 239, 246–47, 522 A.2d 829 (1987).

■ The evidence indicates that Mr. Parkins was not informed of all his treatment options, in that he was not informed of the possibility of operating only on the part of the aneurysm located in his abdomen. Even though this procedure was more dangerous than the surgery performed, all of the experts who testified stated that it was an option and that it did not carry with it the risk of paralysis, since the aorta would be clamped in the abdominal region. By failing to inform Mr. Parkins of this treatment option, Dr. Cambria breached his duty of care to Mr. Parkins and denied him his right to make a fully informed decision with respect to the treatment of his aneurysm.

■ The great preponderance of evidence also indicates that Mr. Parkins was not informed of the risk of paralysis. All of the experts agreed that a 7–10% risk of paralysis is a material risk and that material risks should be disclosed to patients. Dr. August testified that material risks are typically documented in written consent forms. The fact that the consent form signed by Mr. Parkins did not list paralysis as a risk explained to the patient is the most significant evidence that Mr. Parkins was not informed of the risk of paralysis. In addition, the testimony of Dr. August, Mrs. Parkins, and several of the Parkins' sons indicate that Mr. Parkins was not informed of the risk of paralysis. Although Dr. Cambria stated that he did inform Mr. Parkins of the risk of paralysis, his testimony with regard to this fact is not credible in light of the fact he could not remember the members of his surgical team on December 9, 1985, and could not remember several other key facts about Mr. Parkins and his case, including the fact the Mr. Parkins was reluctant to undergo surgery.

■ Having determined that Mr. Parkins was not informed of all treatment options or of the risk of paralysis, the next question to be determined by the court is whether Mr. Parkins reasonably would have chosen a different treatment option if he had been properly and fully informed. As stated above, Connecticut law applies the objective reasonableness standard. *Hammer,* 25 Conn.App. at 712, 596 A.2d 1318. Given the testimony of Mrs. Parkins and several of Mr. Parkins' sons regarding his active lifestyle and attitude about being paralyzed, this court finds that a reasonable person of Mr. Parkins' age, profession, lifestyle, and interests reasonably could decide to live the rest of his life, however short that might be, without undergoing the surgery, and without facing a 7–10% risk of paralysis. Thus, plaintiffs have proven by a preponderance of the evidence that Mr. Parkins would not have consented to thoracoabdominal surgery if he had known that there was a one in ten chance of paralysis.

B. *Wrongful Death*

■ Plaintiffs next claim that the circumstances which led to Mr. Parkins' death

were set in motion by the alleged negligence of Dr. Cambria and his surgical team in conducting a procedure from which the patient emerged without the use of his lower body. An essential element of a negligence action is the establishment by plaintiff of defendant's conduct as a proximate cause of plaintiff's injury. *Wu v. Town of Fairfield,* 204 Conn. 435, 438, 528 A.2d 364 (1987). A prerequisite to a determination of proximate causation is a finding of causation in fact. *Boehm v. Kish,* 201 Conn. 385, 390, 517 A.2d 624 (1986). In a medical malpractice claim, a plaintiff must prove that the defendant practitioner was negligent, that plaintiff suffered harm, and that defendant's negligence was a substantial contributing factor in producing the injuries complained of. *Powers v. United States,* 589 F.Supp. 1084, 1097 (D.Conn.1984); *Pisel v. Stamford Hosp.,* 180 Conn. 314, 334, 430 A.2d 1 (1980). Causation must be removed from the realm of speculation and conjecture. *Pisel,* 180 Conn. at 341–42, 430 A.2d 1. If defendant's acts are a mere incident to the operating cause of injury, they are not such as would impose liability for ultimately unfavorable results. *Connellan v. Coffey,* 122 Conn. 136, 142, 187 A. 901 (1936); *Mahoney v. Beatman,* 110 Conn. 184, 197, 147 A. 762 (1929).

In the instant case, plaintiff has failed to establish by a preponderance of the evidence any causal connection between the death of Frederick Parkins and the provision of or the failure to provide proper medical care by defendant's employees. A patient has a duty to conform reasonably to the necessary prescriptions and treatment and follow reasonable and proper instructions given, and failure to do so which directly and materially contributes to his injury will prevent a recovery in an action for malpractice. *Chubb v. Holmes,* 111 Conn. 482, 488, 150 A. 516 (1930).

The testimony of Dr. Traeger revealed that the final illness and death of Frederick Parkins were caused by a staphylococcus infection which was proximately caused by a failure of personal hygiene while he was under the care of his family at home, and which was exacerbated by the failure of Mr. Parkins and his family promptly to seek medical attention. The conduct of the doctors in 1985 is too far attenuated to be considered a proximate cause of Mr. Parkins' death four years later. At most, the conduct of the doctors in 1985 and Mr. Parkins' paralysis were a "but for" cause of his death.

## C. *Loss of Consortium*

Finally, Mrs. Parkins has filed a claim for loss of consortium as a result of her husband's condition following the 1985 surgery. Under Connecticut common law, a spouse may recover for a loss of consortium occurring during the period between the accident and death of the accident victim. This law recognizes the direct injury suffered by a spouse whose marital relationship changes from an intimate partnership to that of nurse and patient. *Ladd v. Douglas Trucking Co.,* 203 Conn. 187, 189, 523 A.2d 1301 (1987). Loss of consortium, although a separate cause of action, is not truly independent, but rather, derivative to the negligence claim of the injured spouse. *Izzo v. Colonial Penn Ins. Co.,* 203 Conn. 305, 312, 524 A.2d 641 (1987).

Having found defendant negligent in failing to disclose all the treatment options to Mr. Parkins and failing to inform him of the risk of paralysis, Mrs. Parkins claim for loss of consortium is properly before the court. The evidence at trial indicates that the relationship between Mr. and Mrs. Parkins was drastically altered after the surgery. Before the surgery, Mr. and Mrs. Parkins had a solid marriage, cared for each other, and were able to have an intimate physical relationship. Following the surgery, Mrs. Parkins testified that she became her husband's caretaker and protector. No longer was she able to sleep in the same bed or same room with her husband. Nor was she able to have an intimate physical relationship with her husband.

Accordingly, the court finds that Mrs. Parkins is entitled to recover on her loss of consortium claim from the time Mr. Parkins became paralyzed to the time of his death.

## Conclusion

For the reasons set forth above, judgment shall enter for the plaintiffs on the claims of

lack of informed consent and loss of consortium. Judgment shall enter for the defendant United States of America on the claim of wrongful death.

The parties are instructed to file supplemental briefs on damages by October 1, 1993.