**Robert POWERS**

v.

**UNITED STATES of America.**

**Civ. No. H–78–68.**

United States District Court,
D. Connecticut.

May 10, 1984.

Norman Ebenstein, Douglas S. Ebenstein, Hartford, Conn., for plaintiff.

Frank Santoro, Asst. U.S. Atty., Alan H. Nevas, U.S. Atty., New Haven, Conn., for defendant.

## MEMORANDUM OF DECISION

CLARIE, District Judge.

The plaintiff, a resident of Northampton, Massachusetts, brought this action pursuant to the Federal Tort Claims Act to recover damages for alleged medical malpractice in treatment he received at the Veterans' Administration Hospital, in Newington, Connecticut. The case was tried to the Court, without a jury, during the period from February through July of 1982 with intermittent continuances for the conve-

nience of counsel and medical witnesses. The plaintiff and the defendant both presented extensive medical expert testimony during the trial. The Court finds that the plaintiff has proven that the treatment he received was not in accordance with the applicable standard of care and the negligent treatment he received proximately caused him to suffer permanent physical injuries. The Court further finds that the government doctors failed to receive the informed consent of the plaintiff before they performed the operation and the subsequent treatment that followed therefrom. Thus, the plaintiff is entitled to compensation for the injuries caused by the defendant.

## Facts

At the time of trial, in 1982, Robert Powers was a 56-year old male, born September 1, 1925. He was a World War II veteran of the United States Army. Powers began employment as a route salesman for Twin Cleaners of Northampton, Massachusetts in 1948 and he was employed there continuously for twenty-four years until 1972. He was active for many years as a recreational softball umpire and he served two terms as a city councilman in his hometown of Northampton. Powers is married to his wife of thirty-five years and they have no children.

In late 1971, while employed at Twin Cleaners, Powers experienced a fall on the ice, from which he developed pains in his neck. He also began to experience some numbness in his hands and a slight dragging of his right leg. His neck pain became worse over a period of time, and he was forced to leave his employment in early 1972.

On July 3, 1972, Powers had a decompression cervical laminectomy from C3 to C6, performed at Providence Hospital in Holyoke, Massachusetts. A laminectomy is a medical procedure wherein all of the back of the cervical posterior elements are removed. Powers was diagnosed as requiring this procedure because of protruding bone formations or bone spurs that had

developed which were causing pressure on his spinal cord. This bone formation around the bony ring encompassing the cervical spinal cord at the C3–C6 level was caused by a prior injury and was detected by a procedure known as a cervical myelogram, which had been performed before the laminectomy operation. (Testimony of Dr. Hillemeir, Transcript of Court trial, 2/24/82 at 26–34). (Hereinafter, all references to the transcript of the Court trial in this case shall be abbreviated to include the name of the witness, the date and the page). The growth of the bone spurs is a condition known as cervical spondylosis and the laminectomy operation was performed to allow the cord to move away from these bone spurs and thus eliminate the painful pressure. (Sweet, Tr. 7/21/82 at 210–11; Southwick, Tr. 7/22/82 at 433). A cervical myelogram taken before the laminectomy revealed a large bone ridge at the C3–4 level and a smaller bone spur at the C5–6 level. (Robinson, Tr. 6/17/82 at 18–20; Tr. 7/22/82 at 494–95).

The initial results of the 1972 laminectomy were successful and the numbness in the limbs which Powers was experiencing disappeared. Within a short period of time, however, Powers began to experience pain in his neck again and he was unable to return to work. He applied for and received total Social Security disability benefits beginning in June of 1973. Powers continued to experience the pain in his neck, but he did not exhibit any loss of motor functions or any abnormal neurological symptoms.

All physicians agreed that the laminectomy had been performed properly, but the continued symptoms of pain from the shoulder to the back of the neck caused concern among the treating physicians. Dr. Asinas, who had performed the laminectomy, performed additional tests in November of 1973, assisted by a radiologist, to determine whether any subluxation or dislocation of the vertabral segments were causing the pain. Although no definite subluxation was noted at that time, a slight malignment or swan-neck curve of the neck

was noted. (Robinson, Tr. 6/17/82 at 32–33).

Powers had additional x-rays taken at the Lahey Clinic in Boston, Massachusetts in March of 1974, which indicated that there was a small bone spur located at the C5–6 level. (Lakin, Tr. 7/29/82 at 8). There was some indication from an examination of these x-rays that the bony ridges on the vertabrae were becoming more obvious in 1974 than they had been in 1972. (Robinson, Tr. 6/17/82 at 35).

Additional consultation and x-rays were taken at the Veterans' Administration Hospital in Newington, Connecticut (hereinafter "Newington VA Hospital") in the spring of 1974. They disclosed an unstable level at C3–4. (Robinson, Tr. 6/17/82 at 36). Powers' neck had developed a progressive deformity referred to as "kyphosis," which involves excessive angulation of the spine where the head essentially falls forward. (Raycroft, Tr. 5/28/82 at 7). This condition is usually accompanied by subjective pain. There was also some indication of subluxation of C3 on C4, where the vertebrae had partially slipped over one another. (Hillemeir, Tr. 2/23/82 at 34). As Powers' vertebrae began to slip anteriorly, that is, toward the front, his neck began to develop a curvature. An imbalance was produced in which the head fell forward and the remaining joints did not have adequate support. (Southwick, Tr. 6/4/82 at 12).

At this point, the orthopedic surgeons at the Newington VA Hospital strongly recommended a posterior cervical facet fusion of C2 through C7 with a fibula bone graft. The object of this operation was to fuse the bones of the cervical column together, thereby eliminating the excessive motion and dislocation. (Hillemeir, Tr. 2/23/82 at 36). It was not, however, the object of this operation to correct the condition of cervical spondylosis or bone spurring that had

been noted in the pre-laminectomy cervical myelogram and the x-rays taken at the Lahey Clinic. (*Cf.*, Sweet, Tr. 7/21/82 at 172; Robinson, Tr. 6/17/82 at 125; discussion of operative procedures for removing bone spurs).[1]

To perform the cervical fusion, a piece of bone, in this instance a portion of the fibula bone from the patient's leg was removed, split in two lengthwise and grafted onto each side of the posterior cervical spine. The bone-graft is held in place with wires run through holes drilled into the facets of the vertebrae and it eventually becomes permanently fused to the spine as the bone material grows together. (Raycroft, Tr. 5/28/82 at 14; Biondio, Tr. 5/27/82 at 51). Because Powers had previously undergone an extensive laminectomy in 1972, he lacked post-vertebral elements of his cervical spine at this level and it was decided that the fusion should be done posteriorly, that is, from the back, rather than from the front, anteriorly. (Biondino, Tr. 5/27/82 at 15–18; Raycroft, Tr. 5/28/82 at 17). A cervical fusion of this type was characterized by the attending orthopedic surgeon as a "significantly difficult operation." (Raycroft, Tr. 5/28/82 at 16). The cervical fusion was more difficult to perform in this situation because Powers had previously had the cervical laminectomy. (Owens, Tr. 7/29/82 at 130–31; *see also* Hillemeir, Tr. 6/30/82 at 14 "very complicated, intricate problem...").

In March of 1974, Powers had been examined by doctors at the Lahey Clinic who performed, *inter alia*, a general physical examination, which indicated that Powers had full range of motion in his shoulders and no weakness in the extremities. The treating physicians at the Newington VA Hospital also performed standard physical examinations before the 1974 operation to evaluate motor coordination and motor

---

**1.** There was some testimony from Dr. Robinson that bone spurs will disappear gradually over time, following a cervical fusion by a process referred to as bone remodeling (Robinson, Tr. 6/21/82 at 125; Tr. 7/22/82 at 559). This natural process occurs slowly and requires a fusion in the correct anatomical position. Furthermore, there was not testimony from the attending surgeons to indicate that they intended to correct the condition of bone spurs by this process of bone remodeling.

function. No untoward neurological findings were noticed in any of the pre-operative examinations. (Biondino, Tr. 5/27/82 at 21). It should be noted, however, that the treating physicians did not include a neurosurgeon or a neurologist, and a neurological consultation was not sought during any of the pre-operative, operative or immediate post-operative stages of this patient's treatment.

The cervical fusion operation was performed on May 23, 1974, by four doctors: Dr. John F. Raycroft was the senior attending consultant and supervisory surgeon for this operation; he was assisted by Dr. Robert Biondino, Dr. James Cole, and Dr. Pedro Romero. Doctor Biondino was a first-year orthopedic resident at Newington; Dr. Cole was a third-year orthopedic resident; and Dr. Romero was a first-year surgical resident. Dr. Biondino testified that this was the very first cervical fusion he had ever performed for this specific type of problem. (Biondio, Deposition, 5/10/82 at 46). Doctor Raycroft, on the other hand, had engaged in the practice of orthopedic surgery for seven years prior to this operation, and he had previously participated in approximately twenty to twenty-five cervical fusions of this type. (Raycroft, Tr. 5/28/82 at 5). Doctor Raycroft testified that at the time of the operation he mistakenly believed that Dr. Biondino was a third-year orthopedic resident. He was not aware that Dr. Biondino was only a first-year orthopedic resident until the time of trial. (Raycroft, Tr. 5/28/82 at 41, 118).

During the actual surgical procedures, the operative report indicates that functionally Dr. Biondino was the surgeon, Dr. Cole was the first assistant, and Drs. Raycroft and Romero were second assistants. The operative report also indicates that while Drs. Raycroft and Romero operated on the leg to remove the fibula bone for use as bone graft, Drs. Biondino and Cole operated on the neck at the fusion site. The operation itself was uneventful, but it was recorded as taking over five hours to complete. (Plaintiff's Exhibit 20). Normally, an operation of this type is performed in approximately three hours. (Raycroft, Tr. 5/28/82 at 84; Owens, Tr. 3/30/82 at 107).

Once the bone graft was wired in place, the vertebrae of Powers' neck were fixed in position and the instability and forward slippage of the neck was eliminated. In order to fuse the spine in the correct anatomical position, the operating team normally performs a cross-table lateral x-ray during the operation of the cervical region. On this occasion, however, the x-ray was taken after the bone graft had already been wired into place and it did not entirely show the C6 and C7 vertabrae. (Lakin, Tr. 7/29/82 at 10–11). This x-ray was of limited utility in determining whether the neck had been fused in the proper position because the entire cervical region was not visible. (Hillemeir, Tr. 6/30/82 at 47–48). When a cervical fusion is performed on a patient who exhibits bone spurs or spondylosis, the position of the spine after the fusion is critical because the bone spurs must be avoided and the spine should not be so far forward as to cause impingement or compression of the spinal cord. (Sweet, Tr. 7/20/82 at 114–116; Tr. 7/21/82 at 223; Hillemeir, Tr. 6/30/82 at 16; Southwick, Tr. 7/22/82 at 446).

The spinal cord itself is encompassed by fluid and is surrounded by a protective sheath known as the dura. The cord and the dura exist inside the vertebrae in the spinal canal. When the vertebrae exhibit the growth of bone spurs, the spinal canal decreases in size and the threat of impingement or compression of the spinal cord exists. Thus, when a cervical fusion is performed on a patient with these symptoms, the anatomical position of the spinal column is crucial and the spine must be fused so as to avoid such an impingement or compression of the spinal cord and the nearby nerve roots. (Raycroft, Tr. 5/28/82 at 51–52; Sweet, Tr. 7/20/82 at 115–16, Tr. 7/21/82 at 223; Southwick, Tr. 7/22/82 at 446; Hillemeir, Tr. 6/30/82 at 32; Robinson, Tr. 6/17/82 at 46; Tr. 7/22/82 at 587).

The cross-table lateral x-ray is a method for viewing the position of the vertebrae and bone structure, but as an ordinary

x-ray, it does not reveal the position of the spinal cord and it will not completely reveal the existence and size of any bone spurs which might be present. (Robinson, Tr. 7/22/82 at 496). In order to view the spinal cord itself, a procedure known as a cervical myelogram, such as was performed before the laminectomy in 1972, must be performed. In this procedure, a radiopaque dye is injected into the subarachnoid space, that is, directly under the coating that covers the spinal cord. The radiologist observes the flow of this dye on a fluoroscopic screen. (Hillemeir, Tr. 2/23/82 at 95). When the x-ray from the machine strikes the dye, it does not penetrate as it would through the normal spinal cord and spinal fluids. In 1974, a cervical myelogram was performed with such an oil-based dye, known as "pantopaque." The radiologist who did this test would observe the movement of the dye as it traveled down the spinal canal outlining the size and shape of the spinal cord and the nerve root processes. (Owens, Tr. 7/29/82 at 111). In essence, a myelogram is a continual motion study of the dye as it moves down the spinal canal (*Id.*). Particularly with the type of dye, pantopaque, used in 1974, the radiologist who actually performs the myelogram could see more clearly the movement of the dye at the time it is given than would be visible on the individual films. (Taveras, Tr. 7/29/82 at 84–5).

The attending orthopedic surgeon, Dr. Raycroft, testified that a cervical myelographic study is normally considered in preparation for an operation such as this cervical fusion, but he did not specifically recall considering it in this case. (Raycroft, Tr. 5/28/82 at 5). A myelographic study was not performed preoperatively on Powers and upon reflection, Dr. Raycroft, the supervising surgeon, was of the opinion that there was no indication of the need for one. (Raycroft, Tr. 5/28/82 at 12).

Powers was transferred from the operating room after the completion of the procedures and was received in the recovery room at 1:40 P.M. on May 23, 1974. The first significant entry in the postoperative record is a nursing note made by Patricia Michalski, R.N. at 3:00 P.M., which stated: "Patient complains of weakness in right arm—able to lift arm slightly, but not to reach his face, cannot move left arm—seen by Dr. Biondino." (Plaintiff's Exhibit 41). The nursing notes also indicated that Powers had not voided himself of fluids as of 3:50 P.M. on May 23. On the following day, the nursing notes continued to reflect Powers' inability to void through his urinary tract and his complaints of discomfort and pain. At 6:00 P.M. on May 24, another nurse noted that Powers "[t]urned onto left side, unable to move arms." (Plaintiff's Exhibit 41). At 11:30 P.M., the nursing notes indicated that the patient complained of feeling uncomfortable, was unable to void and that his bladder was distended. (*Id.*) Difficulty in voiding is generally recognized as an early sign of spinal cord damages (Owens, Tr. 3/30/82 at 120; Robinson, Tr. 7/22/82 at 503; Southwick, Tr. 6/4/82 at 81); but it is also a fairly common occurrence after surgery in the cervical region. (Southwick, Tr. 6/4/82 at 81). Powers continued to have difficulty voiding his bladder voluntarily, but he was not catherized until 7:05 A.M. on May 25, 1974, and approximately 900 cc of urine was obtained at that time. (Plaintiff's Exhibit 41; Owens, Tr. 3/30/82 at 120–24).

Doctors Biondino and Cole, the orthopedic residents, and Dr. Romero, the general surgical resident, visited Powers on a regular basis during the post-operative period and they conducted examinations and tests of his reflexes, muscle ability and sensory capacity. The results of these tests were somewhat inconsistent and conflicting, but Dr. Romero testified that it was apparent to him that Powers was suffering from upper extremity weakness on the day after the operation. (Romero, Tr. 6/4/82 at 64). Doctor Romero also recognized that Powers' abnormal muscle strength in his upper extremities indicated a possibility of irritation of the nerve roots. (*Id.* at 62). His observations were made in conjunction with and communicated to Dr. Biondino, who

was primarily responsible for this patient's care. (*Id.* at 64).

Dr. Biondino's testimony was inconsistent with the testimony of his colleague, Dr. Romero, and his own post-operative notes. At one point he testified that Powers' neurological reflexes were normal and the restricted motion noted by the nurses was due to the normal pain and discomfort associated with surgery. (Biondino, Tr. 5/27/82 at 180). Dr. Biondino felt that the diminished sensory reaction was an hysterical reaction to the trauma of the surgery. (Biondino, Tr. 5/27/82 at 181, 186). Dr. Biondino testified that "[t]he patient had normal squeeze in his hands in the recovery room." (*Id.* at 63). However, Dr. Biondino's progress notes of May 25, 1974, stated: "still with decreased ability to squeeze—numbness bilaterally—very difficult to evaluate." (Plaintiff's Exhibit 27). While testifying, Dr. Biondino incredibly ignored the symbol, an arrow pointing downward, written in his notes immediately before the words "ability to squeeze" (Biondino, Tr. 5/27/82 at 76, 145–46). Only during cross-examination did he admit that the downward arrow was written to mean "decreased". (*Id.* at 146). When Dr. Biondino was asked about the nurse's note of May 23, which stated that the patient "cannot move left arm," he admitted that this was an "alarming symptom," and that the nurse had asked him to see the patient at that point. (Biondino, Tr. 5/27/82 at 161).

Dr. Romero testified that the results of his reflex test were to a certain degree abnormal, as indicated in his notes, and he discussed this with Dr. Biondino. (Romero, Tr. 6/4/82 at 61–62). Dr. Biondino testified, however, that "[w]e felt, at that time, that his neurological reflexes were normal." (Biondino, Tr. 5/27/82 at 180). Dr. Biondino went on to testify that Dr. Romero's numerical results of his reflex test as noted in the progress notes were recorded incorrectly. (*Id.* at 163–64, 171–73). In addition to the inconsistency of his testimony, Dr. Biondino had difficulty answering very simple questions from the Court concerning the details of Powers' post-opera-

tive care. (Biondino, Tr. 5/27/82 at 184–87).

Dr. Raycroft was, in 1974, a consultant at the Newington VA Hospital and he was the orthopedic surgeon in the Hartford area who was generally recognized as having had considerable experience in performing cervical fusions. He visited the Newington VA Hospital perhaps once or twice a year to instruct resident physicians who were in training and assist at surgery. (Raycroft, Tr. 5/28/82 at 8). Dr. Raycroft was the senior attending orthopedic surgeon for this operation, but he never saw the patient at any time after the surgery. (*Id.* at 18). In fact, Dr. Raycroft had never seen Powers before the surgery, and he had prepared for the operation merely by reviewing certain x-rays with Drs. Biondino and Cole. (*Id.* at 43–44). Dr. Raycroft had not, however, reviewed any hospital records concerning the previous laminectomy which Powers had undergone in 1972. (*Id.* at 43–44). In addition, Dr. Biondino himself testified that he was not at all sure of the reasons why Powers had undergone such an extensive prior laminectomy. (Biondino, Tr. 5/27/82 at 13).

Although Dr. Raycroft was the senior attending surgeon and doctor in charge for this operation, the operative notes were dictated by Dr. Biondino and later approved by Dr. Richard Worrell, who was not even present during this surgery. (Owens, Tr. 3/30/82 at 113; Plaintiff's Exhibit 20). Dr. Raycroft was contacted by Dr. Biondino at least twice by telephone concerning Powers' post-operative situation. (Raycroft, Tr. 5/28/82 at 74). Dr. Biondino testified that on one occasion within a few days of the operation, he visited Dr. Raycroft at his office to discuss an immobilization device for Powers. (Biondino, Tr. 5/27/82 at 188). Dr. Biondino also testified that he specifically discussed with Dr. Raycroft the patient's upper extremity weakness, the fact that it appeared to be symmetrical, and his conclusion that the symptoms were of hysterical origin. (*Id.* at 186). Notwithstanding the serious nature of the post-operative symptoms, Dr. Raycroft was not asked to return to see the patient nor did he volun-

teer to do so; on the basis of his conversations with Dr. Biondino, he concluded that his presence was not required. (Raycroft, Tr. 5/28/82 at 75–77).

Powers remained at the Newington VA Hospital until the end of July, 1974, but his condition did not improve. The testimony and recorded observations of the nurses who attended Powers while he was at the Newington VA Hospital indicate that he exhibited extremely distressful, if somewhat confusing symptoms. One of the nurses who had frequent contact with Powers was Robert L. LaBissoniere. He remembered that on the first day Powers was in his ward after the operation, Powers complained of numbness in his hands, inability to move his hands or fingers, and arm pains. (LaBissoniere, Tr. 5/26/82 at 163, 207). It was suggested to the nurses by Dr. Biondino that Powers' condition and his complaints were due to normal discomfort from post-surgical edema, or swelling of the operative area, and that exercise and the use of a neck collar would help clear up the problem. (Id. at 163). Male Nurse LaBissoniere took care of Powers and eventually attended to his shaving and bathing needs because Powers lost the use of his arms. (Id. at 210). He also remembered that Powers exhibited objective signs of experiencing great physical discomfort and pain during the period initially after the surgery. (Id. at 211–12).

Immediately after the surgery, the nurses reported that Powers was extremely restless in bed; he was thrashing around and constantly complaining of neck pain. (McGuire, Tr. 5/26/82 at 42–49). After about two weeks, when Powers was no longer confined to his bed, his complaints centered on the immobility of his arms and on the unnatural position he assumed when he walked. His hands were held at waist level, with the elbows bent and his shoulders hunched over. (McGuire, Tr. 5/26/82 at 59). This condition has continued to the present time.

The nurses' observations, like those of the treating physicians, were not entirely consistent. Nurse McGuire testified that for a while Powers was able to feed himself, raise his arms for bathing, put his own slippers on and ring the buzzer for the nurse. All of these activities required use of his arms and hands. (McGuire, Tr. 5/26/82 at 50–75). The nurses agreed, however, that Powers was a difficult patient who complained excessively, refused to cooperate many times and was child-like with his demands. (Id. at 24, 30, 49, 52; LaBissoniere, Tr. 5/26/82 at 162). Powers had earlier exhibited some psychological problems, (Plaintiff's Exhibit 54; Tallent, Tr. 5/25/82 at 66), and there is little question but that he was a very difficult patient to care for. It became obvious to the Court, however, that the nurses' opinion of Powers' condition was drastically tainted by comments made by Powers while at the Newington VA Hospital regarding the prospective institution of this lawsuit against the attending doctors and the Newington VA Hospital itself. (McGuire, Tr. 5/26/82 at 82–86; LaBissoniere, Tr. 5/26/82 at 175). When Powers began openly to assert to other patients that the doctors at the Newington VA Hospital had "screwed him up" and that he would sue and "become a millionaire," the nurses' attitude toward him declined considerably. (Id.).

During this period post-operatively, the treating physicians attempted to explain Powers' worsening condition on a psychological basis. According to Dr. Biondino, Powers' symptoms seemed to vary greatly in an obvious and dramatic way, which he referred to as "waxing and waning" and as a "rather bizarre neurological pattern." (Biondino, Tr. 5/27/82 at 85, 90). Dr. Biondino referred to these symptoms as "suspicious" (Id. at 97), and as suggesting an hysterical-type reaction to the examinations of the different physicians. (Biondino, Tr. 6/8/82 #2 at 20). Dr. Biondino did not feel any need to reoperate and he did not see any need for an immediate neurological consultation. (Biondino, Tr. 5/27/82 at 93, 102). Looking back on the problem, however, Dr. Biondino testified that it probably would have been a better course of action to have called a neurosurgeon or neurolo-

gist for consultation promptly at that time. (*Id.* at 169–70).

On May 29, 1974, Dr. Biondino performed his own neurological examination and recorded his observations in his progress notes. (Plaintiff's Exhibit 27). He found a loss of sensation in the hand, weak dorsiflexion and bilaterial nerve weakness. (Id.). His notes state that he suggested the problem was "supratentorial," i.e., psychological (Owens, Tr. 3/30/82 at 137) or from the brain, but he concluded that the situation was "really difficult to evaluate." (Plaintiff's Exhibit 27). On June 3, 1974, Dr. Biondino's progress notes state that the patient "continues with bizarre neurological evaluation." (*Id.*) The next physician's progress note was not until seven days later, June 10, 1974, seventeen days after the surgery, when Dr. Biondino wrote that the numbness in the hand had continued. Dr. Biondino also included his own hypothesis concerning Powers' problem: "Perhaps in straightening the hyphosis we've stretched the nerve roots?" (*Id.*) This note, which was written eleven days after the cervical fusion operation, is the first recognition by the treating physician that Powers' problem might be organic in nature and related to the surgery.

On June 16, 1974, Dr. Biondino requested that an electomyography ("EMG") test be performed on Powers and this was done on June 22, 1974. An EMG is a test which indicates whether nerve root damage exists by placing electrodes in various muscle groups. If there is nerve root damage, abnormal waves will show on the oscilloscope. (Hillemeir, Tr. 2/23/82 at 71). The EMG consultation report indicated activity of nerve irritation in the left arm, shoulder, and hand muscles mixed with denervation potentials (fibrillations). The impression of an examiner was that Powers suffered from bilateral nerve root syndrome at C5, C6, C7, and C8. (Plaintiff's Exhibit 49). There is nothing to indicate, however, that the treating physicians took any cognizance of the EMG findings because the next treatment ordered was a psychiatric consul-

tation, which made no mention of the EMG findings. (Owens, Tr. 3/30/82 at 144).

Dr. Biondino, who had been primarily responsible for Powers, did not see him after late June of 1974, as Dr. Biondino was routinely rotated out of his service at Newington VA Hospital. (Biondino, Tr. 6/8/82 # 2 at 7). The psychiatric consultation was obtained on June 26, 1974, but it was inconclusive and it did not support the theory that hysteria was the real cause of Powers' paralysis. (Plaintiff's Exhibit 54; Owens, Tr. 3/30/82 at 143). The consultation and treatment which Powers received from the Newington VA Hospital during this time period was primarily psychological in conjunction with some physical therapy. There was one consultation report dated July 2, 1974, from a neurologist, Dr. M.C. Barrick, but she failed to find any specific lesion or evidence of active root or cord compression. (Plaintiff's Exhibit 49).

Powers was discharged from the Newington VA Hospital on August 3, 1974, but the paralysis in his upper extremities remains with him and has not improved. On September 17, 1974, Dr. Perovic performed a cervical myelogram on Powers. Dr. Perovic's report states, in part:

"Above T1 the canal is extremely narrow, the cord is flattened and enlarged .... The cord is compressed at the level of C5–C6–C7." (Defendant's Exhibit G).

Almost two years later, on June 26, 1976, at the Peter Bent Brigham Hospital, another cervical myelogram was performed on Powers. The report states that the myelogram "revealed a probable narrowing of the cervical spinal canal at C5 and C6 with some suggestion of impingement on the cord at this level." (Defendant's Exhibit EEEE).

Based on a review of these two myelographic studies, Dr. Robert A. Robinson testified that, in his opinion, the spinal cord was impinging on C5 and C6. (Robinson, Tr. 7/22/82 at 534). This impingement was demonstrated to the Court by its viewing and having the same demonstrated and explained through the myelographic films and testified to by several medical experts. (Id.

at 530–31; Sweet, Tr. 7/21/82 at 143–46; Southwick, Tr. 7/22/82 at 371–73; Taveras, Tr. 7/29/82 at 35–39, 48). Although the defendant's experts disagreed with the conclusion of actual impingement, or compression of the spinal cord, they acknowledged that the myelographic films demonstrated an abnormality at the C5 and C6 level. (*Id.*) Dr. Lakin, a radiologist who testified on behalf of the plaintiff, agreed with Dr. Robinson that there was demonstrated actual impingement of the spinal cord at C5 due to a bone spur at the C5–6 level. (Lakin, Tr. 7/29/82 at 26–28; *see also* Hillemeir, Tr. 6/30/82 at 102; Owens, Tr. 7/29/82 at 137–39; both doctors agreed with Dr. Robinson's theory after a complete review of available x-rays).

Powers' spinal cord became impinged, or compressed, on the bony ridges at the C5–6 level because his spine was fused at an excessively forward angle. The cervical fusion should have fused the neck in a more normal, upright position. However, according to Dr. Robinson, Powers' neck was instead fused at an anterior angle of twenty-five degrees. (Robinson, Tr. 6/17/82 at 41; Tr. 7/22/82 at 508). Because his spine was permanently fused in an anterior flexion, or forward position, the nerve roots to the spinal cord were irritated by the pressure of the protruding bone spurs. (Robinson, Tr. 7/22/82 at 526). Dr. Robinson's findings were that Powers suffered spinal cord impingement and nerve root compression because the excessive anterior angulation of the spine after the fusion brought the cord into constant contact with the pre-existing bony ridges on Powers' vertebrae. (Robinson, Tr. 7/22/82 at 526, 535).

Dr. Robinson determined the exact angulation of Powers' neck after the cervical fusion by comparing several pre-fusion and post-fusion x-rays. (*Id.* at 505–08). Two other doctors who testified similarly compared x-rays and agreed with Dr. Robinson's conclusion of excessive anterior angulation, although they differed slightly as to the exact degree of the increased angulation. (Hillemeir, Tr. 6/30/82 at 26–28; Lakin, Tr. 7/29/82 at 18–19, 95). While several of the defendant's expert witnesses recognized that some angulation was present, they disagreed with the conclusions drawn from the existence of such angulation. In the words of Dr. Southwick, who testified extensively on behalf of the defendant:

"Well, I think there is some angulation present, and there is some irregularity. But I think that the—I don't agree with Dr. Robinson that the angulation, per se, would cause the spinal cord dysfunction." (Southwick, Tr. 7/22/82 at 405; *see also* Sweet, Tr. 7/20/82 at 93).

In response to the Court's question about the hazy area of the myelogram film where Dr. Robinson felt that there was spinal cord impingement, Dr. Southwick agreed that the film did indicate that the cord was "butting up against" the bone ridge at that point, but he did not believe that it demonstrated actual pressure on the cord. (Southwick, Tr. 7/22/82 at 373; *see also* Id. at 408 "the cord is touching ... a membrane, anteriorally.")

Practically all of the medical experts who testified agreed that partial paralysis of the upper extremities, such as Powers' condition portrays, is indicative of anterior spinal cord and nerve root damage, also known as "central cord syndrome." (Robinson, Tr. 6/17/82 at 128; Southwick, Tr. 6/4/82 at 28–30; Biondino, Tr. 5/27/82 at 55–56; Raycroft, Tr. 5/28/82 at 52; Romero, Tr. 6/4/82 at 62; Sweet, Tr. 7/20/82 at 28–29, 41). The point of departure for the medical expert witnesses was that while the plaintiff's experts determined that the most probable anatomical reason or cause for Powers' condition was anterior spinal cord impingement and nerve root damage due to the excessive post-fusion angulation, the defendant's medical experts, including many treating physicians, remained puzzled and admitted that they could not offer an anatomical explanation for Powers' condition. (Raycroft, Tr. 5/28/82 at 31, 109; Southwick, Tr. 6/4/82 at 14, 21, 92). The defendant's witnesses preferred to rely on a theory that the paralysis was caused by hysterical or psychological factors.

(Sweet, Tr. 7/20/82 at 28–29; Aronoff, Tr. 7/23/82 at 34).

In order to attempt to refute the defendant's theory, the plaintiff submitted a video tape of an interview with Powers while he was under the influence of sodium amytal. (Plaintiff's Exhibit 226). There was extensive testimony that an amytal interview or an interview with the patient while under hypnosis are two alternative methods for determining whether a patient suffers psychological paralysis, or actual, organically caused paralysis. (Hillemeir, Tr. 2/24/82 at 283; Sweet, Tr. 7/21/82 at 304; Felber, Tr. 2/25/82 at 82). Powers had not undergone either of these tests at any time during his treatment prior to this trial. The amytal interview was conducted on July 26, 1982, and the video tape of the interview was exhibited before the Court on July 30, 1982. During the amytal interview and while under the influence of the drug, Powers did not demonstrate any increase in the mobility of his upper extremities and he did not experience any decrease in the pain in his hands and neck. (Plaintiff's Exhibit 226). Powers responses during sodium amytal interview indicated to the Court, that at the time the interview was conducted, his paralysis was real and not proximately caused by psychological or hysterical factors.

Another objective measure of a patient's ability to control his muscle and limb movement is an EMG test. (Hillemeir, Tr. 2/23/82 at 73–74). A patient cannot "fake" an EMG test and the EMG test is regarded as extremely accurate. (Southwick, Tr. 7/22/82 at 417–18). Powers' paralysis in the post-operative period was objectively demonstrated by the EMG test performed on June 22, 1974. (Robinson, Tr. 6/17/82 at 162; Plaintiff's Exhibit 49). Over the course of the next three years, four additional EMG tests were performed, which also objectively indicated organic nerve root damage as the cause of Powers' paralysis. (*See* Plaintiff's Exhibit 85, EMG

of 9/14/74; Plaintiff's Exhibit 133, EMG of 9/2/76; Defendant's Exhibit DDDD, EMG of 2/11/77; Defendant's Exhibit # 000, EMG of 3/8/77).

*Discussion of Law*

A. *Liability*

■ The plaintiff brought this action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*, and this Court has jurisdiction pursuant to 28 U.S.C. § 1346(b). In any action under the FTCA, the substantive law of the place where the wrongful act or omission occurred is to be applied. *Id.; Dinnerstein v. United States*, 486 F.2d 34 (2d Cir.1973). Powers has alleged that the physicians at the Newington VA Hospital, located in Newington, Connecticut, were negligent in failing to obtain the plaintiff's informed consent before surgery, and in performing the surgery and post-operative care which he received at that hospital. The substantive law of the State of Connecticut will therefore be applied to this action.

1. *Lack of Informed Consent*

■ The Connecticut Supreme Court has only recently addressed the issue of informed consent in a substantive fashion. In *Logan v. Greenwich Hospital Association*, 191 Conn. 282, 465 A.2d 294 (1983), the Connecticut Supreme Court stated that "the failure to make a sufficient disclosure ... has been regarded by most courts as presenting the question ... whether the physician has fulfilled his duty of informing the patient under the appropriate standard." *Id.*, at 289, 465 A.2d 294. Further, the Court adopted as their appropriate standard the "lay" standard enunciated by *Canterbury v. Spence*, 464 F.2d 772 (D.C.Cir.1972), *cert. denied*, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 and explained by the *Logan* trial court in its jury instructions. *Logan, supra*, at 290–93 [2], 465 A.2d

---

**2.** Although the Supreme Court of Connecticut overturned the jury instructions on one particular issue (the trial court's failure to charge properly on reasonable alternatives), the Supreme

Court stated that the instructions as a whole epitomized the essentials of the "lay" standard articulated by *Canterbury. Logan, supra*, at 293, n. 4, 465 A.2d 294.

294. Under this standard, the courts have imposed a duty upon

"a doctor which is completely separate and distinct from his responsibility to skillfully diagnose and treat the patient's ills. A physician is bound to disclose all known material risks peculiar to the proposed procedure. Materiality is defined as the significance a reasonable person in what the physician knows, or should know, in his patient's position would attach to the disclosed risk or risks in deciding whether to submit or not to submit to the [proposed procedure]. It is the duty of the physician to give a patient whose situation otherwise permits it all information material to the decision to undergo the proposed procedure." *Id.* at 287, n. 1, 465 A.2d 294.

The Court finds that the defendant's conduct in this case failed to satisfy the requirements of the "lay" standard herein cited.

Two doctors spoke to the plaintiff about the general risks of this procedure. Although it is well-established that a significant percentage of persons who undergo the fusion at issue, 8–10%, experience post-operative neurological problems, (Southwick, Tr. 6/4/82, at 51; Biondino, Tr. 5/27/82 at 86), the evidence indicated that neither of these two doctors discussed this "known material risk[ ] peculiar to the proper procedure" with the plaintiff.

Dr. Pedro Romero, a general surgical intern with no orthopedic training, explained only the risks of general anaesthesia to the plaintiff. (Romero, Tr. 6/4/82 at 44). At that time, he was not familiar with the surgical procedure to which the plaintiff was about to submit. (*Id.*, at 14–15, 47). Dr. Romero assumed that Dr. Biondino would explain or had explained the specific risks of the operation to the plaintiff, (*Id.*, at 52), and thus, most shockingly signed and witnesses the consent form in blank, without having filled in the most essential section: that section intended to list the nature, purpose and risks of the operation. (*Id.* at 15–16, *see* Defendant's Exhibit J). Dr. Romero's only explanation

for his failure to do so was that he expected Dr. Biondino to co-sign the form after describing the risks to the plaintiff. Moreover, whatever problems already existed about the propriety of the "consent" obtained by Dr. Romero were exacerbated by the fact that Dr. Romero's ability to speak understandable English was poor at the time of trial and was admittedly much poorer almost eight years previously, at the time of the plaintiff's fusion. (*Id.* at 35–36). Thus, whatever authorization Dr. Romero obtained from the plaintiff was predicated on far less than the informed consent required under the Connecticut standard.

Dr. Biondino, the surgeon who actually performed the ill-fated fusion, also spoke to the plaintiff before the operation, in the presence of Nurse McGuire. Although there is conflicting testimony as to whether Dr. Biondino informed the plaintiff of the risk of paralysis (compare Powers' testimony in this regard with that of Biondino, Tr. 6/8/82 at 37, and with that of McGuire, Tr. 5/26/82 at 18, 20), the Court finds that Dr. Biondino did not properly inform the plaintiff of the risks thereof. Were the issue of disclosure to have boiled down to a "swearing contest" between the plaintiff and the treating physician and nurse, the Court would have been more inclined to find that disclosure had taken place. However, the consent form itself (Defendant's Exhibit J) argues powerfully and convincingly for the proposition that the plaintiff was never advised of the material risks inherent in the fusion. Dr. Biondino's failure to fill in the section listing the nature, purpose and risks of the operation or to co-sign the form belies Nurse McGuire's already uncertain testimony that Dr. Biondino actually informed the plaintiff of the possibilities of paralysis. (McGuire, Tr. 5/26/82 at 18, 20, 132–33). Not having available the knowledge of material risks, risks which the physicians knew or should have known would be important to any reasonable person in deciding whether or not to undergo the fusion, Powers' consent, as indicated by his signature on the authorization form, was not informed, and was, in fact, virtually a

nullity. Powers clearly indicated that, had he been properly informed of the dangers of the operation in advance, he would not have consented to the surgery as it was performed. Thus, the defendant breached its duty of providing material information which was essential and necessary so that the plaintiff could make an informed judgment about, and give an informed consent to this surgery.

### 2. Negligence of Surgery and Postoperative Care

To recover in a surgical medical malpractice action in Connecticut, a plaintiff must prove that the defendant was negligent, that the plaintiff was harmed, and that the " 'negligence of the surgeon [or physician was] a substantial contributing factor in producing the injuries complained of.'" *Connellan v. Coffey*, 122 Conn. 136, 138–40, 187 A. 901 (1936). To establish that a physician was negligent, the plaintiff must prove that the physician failed to exercise that degree of diligence and skill, which other physicians in the same general neighborhood and in the same line of practice, ordinarily exercise in similar cases. *Katsetos v. Nolan*, 170 Conn. 637, 644–45, 368 A.2d 172 (1976); *Fitzmaurice v. Flynn*, 167 Conn. 609, 356 A.2d 887 (1975); *Decho v. Shutkin*, 144 Conn. 102, 127 A.2d 618 (1954). For purposes of determining the standard of care applicable to the Newington VA Hospital, the pertinent geographic neighborhood includes at least the entire State of Connecticut. *Pisel v. Stamford Hospital*, 180 Conn. 314, 335, 430 A.2d 1 (1980).

The plaintiff must generally submit expert testimony to establish both the standard of care and the fact that the defendant's conduct did not measure up to that standard. *Pisel, supra* at 334, 430 A.2d 1; *Fitzmaurice, supra* 167 Conn. at 616, 356 A.2d 887. One of the tests for determining whether the defendant's conduct measured up to the standard of care is whether the harm that resulted from the lack of care could reasonably have been foreseen. The plaintiff need not prove, however, that the defendant could foresee that his injuries would occur in exactly the manner they did. It is sufficient that the defendant knew or should have known that harm of the general nature of that suffered by the plaintiff was likely to result unless reasonable care was taken. The concept of foreseeability is applied to determine if the harm that resulted was within the scope of the risk created by the defendant's conduct. *Pisel, supra* 180 Conn. at 331–32, 430 A.2d 1.

Expert testimony is also normally required to establish the causal relationship between the breach of the standard of care and the plaintiff's injuries. *Marrone v. United States*, 355 F.2d 238, 241 (2d Cir.1966); *Ardoline v. Keegan*, 140 Conn. 552, 558, 102 A.2d 352 (1954). The breach of the standard of care by the physician, that is his negligence, must have been a substantial contributing factor to the damages suffered by the plaintiff. *Grody v. Tulin*, 170 Conn. 443, 448, 365 A.2d 1076 (1976). Unusual or bizarre results can become a factor on the question of proximate cause, but only when with the benefit of hindsight it appears highly extraordinary that the defendant's negligent conduct should have brought about the plaintiff's injuries. *Pisel, supra* 180 Conn. at 341–42, 430 A.2d 1.

#### a. Negligence of Surgery

The Court finds that the plaintiff has established, by a preponderance of the evidence, that the operation itself was performed negligently. The Court further finds that had the surgery been performed properly, it is likely that the plaintiff would not have suffered from the paresis of both arms, a condition which now afflicts him.

On May 23, 1974, Mr. Powers underwent a posterior bilateral cervical facet fusion from C2 through C7, utilizing a fibular bone graft. (Hillemeir, Tr. 2/23/82 at 35–36). In this operation, the bones of the cervical column are fused together in attempt to limit motion for a particular purpose. (*Id.* at 36). Dr. Biondino sought to prove an erect posture for the plaintiff's

**1100**

neck. (Biondino, Tr. 5/27/82 at 15). After the operation was completed, the plaintiff exhibited symptoms of paresis of both arms. After examining the comprehensive medical evidence, the Court finds the testimony of Dr. Richard Robinson credible and convincing. (Robinson, Tr. 7/22/82 at 492–535).

Dr. Robinson compared the pre-fusion and post-fusion myelograms of the plaintiff (Plaintiff's Exhibits 171–174 inclusive) and found a compression of the nerve roots around "[C] 3, 4 and 5, 6 and 7." (*Id.* at 535). This compression was caused by the impingement of the spinal cord on "C5 and 6, particularly." (*Id.* at 533). This impingement resulted from the fact that the fusion at issue changed the angle of the cervical vertebrae and bone spurs which had grown therefrom, so that they jutted outwards and pressed against the anterior aspects of the spinal cord. (*Id.* at 507–19). The fact that the post-fusion myelograms showed no pantopaque dye in the area of C5 and C6 demonstrated the impingement. (*Id.* at 528) The impingement was illustrated further by the fact that the spinal cord could not float away from the vertebral hump as it normally would when the plaintiff was flat on his back; the cord, rather, was "tethered" to the vertebral spurs. (*Id.* at 529). This impingement impeded the "fine circulation of [the plaintiff's] spinal cord" and caused the clinically confusing paresis that followed. (*Id.* at 535).

Dr. Robinson's conclusion was buttressed by the opinions of other experts. In 1976, non-witness Drs. Kim and Rambaugh, who analyzed the post-fusion myelograms at Peter Bent Brigham Hospital in Boston, found impingement of "the bodies C5–6 and 7" on the "cervical cord." (Defendant's Exhibit EEEE at 4). The plaintiff's witness, Dr. Paul Lakin found flattening of the cord which he interpreted to reveal compression. (Lakin, Tr. 7/29/82 at 37). Even the defendant's expert witnesses, Drs. Sweet and Southwick, found evidence of pressure (Sweet, Tr. 7/21/82 at 147–48) or at least contact between the vertebral spurs and the cord. (Southwick, Tr. 7/22/82 at 373).

The Court finds that the surgeons who performed the plaintiff's fusion failed to adequately take into account his unique, pre-fusion spinal condition, including his bone spurs and cervical subluxation. As a result, they fused the plaintiff's cervical spine at an excessive angulation for him and, in so doing, failed to exercise the good judgment required in each individual case by the standard of due care involved. (*Id.* at 524).

The mere fact that excessive angulation had never previously been recognized as a possible cause of paresis in medical literature (Southwick, Tr. 7/22/82 at 388–89) does not remove it from the realm of reasonably foreseeable harm. There are some medical dangers which are so universally and fundamentally recognized, i.e., that an interruption of blood supply will cause nerve damage, that the failure to guard against such deleterious consequences amounts to a foreseeable breach of a physician's duty of care. The Court finds, therefore, that the surgeon's fusion of the plaintiff's cervical spine at such an angle as to cause impingement upon the spinal cord and cut off circulation to certain nerve root endings at equal levels affecting both sides was negligence and was the proximate cause of the plaintiff's parasis.

### b. *Negligence of Postoperative Care*

The Court finds that the plaintiff has established by a preponderance of the evidence, which included expert medical testimony, that the postoperative care which he received did not measure up to the standards of care ordinarily exercised in similar cases in Connecticut. The Court also finds that if the postoperative care of the plaintiff had complied with the standard of care as it existed in 1974, it is more probable than not that Powers would not now suffer from permanent partial paralysis of his upper extremities.

The symptoms which Powers exhibited immediately after the cervical fusion operation indicated an abnormal neurological deficit, which created an immediate cause

for concern. (Robinson, Tr. 6/17/82 at 65). The orthopedic resident who was in charge of Powers at that time, Dr. Biondino, lacked the experience necessary to recognize the severity of Powers' condition and the need for immediate corrective action. (Owens, Tr. 7/29/82 at 123; Hillemeir, Tr. 6/20/82 at 52; Robinson, Tr. 6/17/82 at 52). In order to have had a fair chance of success, corrective action should have been initiated within the first 48 to 72 hours after the surgery. (Owens, Tr. 3/30/82 at 119, 149, 154; Hillemeir, Tr. 2/23/82 at 146, 283; Robinson, Tr. 6/17/82 at 66). Dr. Biondino's failure to attempt additional diagnostic or surgical procedures at this stage constituted a breach of the standard of care. (Hillemeir, Tr. 2/23/82 at 127–38; Tr. 6/30/82 at 51–52).

The senior attending orthopedic surgeon for the operation, Dr. Raycroft, having been alerted to the problem by Dr. Biondino, failed to adequately monitor Powers' condition and he offered Dr. Biondino virtually no personal diagnostic supervision and assistance in correcting his postoperative condition. Dr. Raycroft had the ultimate responsibility for Powers (Owens, Tr. 3/31/82 at 192; Raycroft, Tr. 5/28/82 at 13), and for him to entrust Powers' care entirely to a first-year orthopedic resident at this crucial stage of a very alarming post-surgical condition was a breach of the standard of care. (Hillemeir, Tr. 2/23/82 at 83–84, 287–88; Tr. 6/30/82 at 51–52; Robinson, Tr. 7/22/82 at 537–39; Owens, Tr. 7/29/82 at 170).

■ In light of Powers' previous laminectomy, and his condition of cervical spondylosis, it would have been professionally advisable to have performed a cervical myelogram before and after this operation. (Robinson, Tr. 6/17/82 at 53; Tr. 7/22/82 at 535). A preoperative myelogram could have been compared with a postoperative myelogram to determine what was causing Powers' postoperative neurological problems. (Id.; Hillemeir, Tr. 2/23/82 at 114, 200; Tr. 6/30/82 at 51, 92; Owens, Tr. 7/29/82 at 139–41). Although the absence of these cervical myelograms may not have

been a breach of the standard of care as it existed in 1974, the failure to obtain adequate x-rays of the entire cervical region, including the position of the fusion graft, on a patient with Powers' history was inexcusable. None of the attending surgeons adequately recognized the complications presented by Powers' history of cervical spondylosis and their failure to insure that his neck was fused in the correct anatomical position was a breach of the standard of care. (Hillemeir, Tr. 6/30/82 at 51).

The incorrect and changed anatomical position of Powers' neck after the cervical fusion, in combination with his condition of cervical spondylosis, most likely caused Powers to experience his postoperative neurological symptoms. (Robinson, Tr. 6/17/82 at 102; Tr. 7/22/82 at 522–26; Hillemeir, Tr. 6/30/82 at 50–51; Owens, Tr. 7/29/82 at 137–39). If the attending physicians had undertaken the proper diagnostic procedures in a timely fashion, corrective surgical procedures could have been performed which would have successfully eliminated the likely cause of Powers' symptoms, the excessive pressure on his spinal cord. (Robinson, Tr. 6/17/82 at 147; Owens, Tr. 7/29/82 at 136). However, during the critical 72 hour period following the surgery, Dr. Biondino failed to attempt the diagnostic or surgical procedures which would have revealed the problem, and he received no adequate consultation from Dr. Raycroft.

Drs. Raycroft and Biondino both specialize in orthopedics and, while testifying, each admitted that a neurologist or a neuro-surgeon could have assisted greatly in the postoperative diagnosis of Powers' condition. (Raycroft, Tr. 5/28/82 at 65, 164; Biondino, Tr. 5/27/82 at 169–70). The failure to obtain a neurological consultation until almost six weeks after the cervical fusion operation was a clear breach of the standard of care. (Hillemeir, Tr. 2/23/82 at 228; Robinson, Tr. 7/22/82 at 556; Owens, Tr. 7/29/82 at 123).

■ When Powers began to exhibit abnormal neurological symptoms within the first 24 hours following his surgery, the

failure to promptly act, on the part of both Dr. Biondino and Dr. Raycroft, constituted a breach of the standard of care which proximately caused the plaintiff's injuries. The fact that these doctors did not foresee the specific complications which Powers exhibited, or the fact that Powers exhibited bizarre or unusual symptoms, cannot avail the defendant, because the plaintiff's injuries were clearly within the scope of the risk created by their failure to act. (Sweet, Tr. 7/20/82 at 114–116; Tr. 7/21/82 at 223; Southwick, Tr. 7/22/82 at 446; Robinson, Tr. 6/17/82 at 71, 128–129; Tr. 7/22/82 at 578–587; Raycroft, Tr. 5/28/82 at 30, 51–52). Thus, the plaintiff has proven that the defendant doctors failed to exercise the requisite standard of medical care and that their negligence was a significant contributing factor to, or a proximate cause of, the harm which the plaintiff suffered.

## B. *Damages*

Having found liability, the Court now turns its attention to damages. The Court shall consider two preliminary matters which affect the calculation of other damages in this case, namely life expectancy and the discount factor.

### 1. *Life Expectancy*

■ The Court, having heard eight medical experts testify as to their observations and predictions of the plaintiff's life expectancy, notes the following. These eight experts differed markedly in their estimates of Powers' life expectancy, from the low estimate of Nurse Mary Yarrows, one of the defendant's experts, who claimed that if the matter were not decided soon, it would be rendered academic, "because Bob isn't going to be here," (Yarrows, Tr. 6/9/82 at 94) to the high estimate of Dr. Eli Sagall, one of the plaintiff's expert witnesses, who testified that Powers should live from 12 to 17 years longer.

(Sagall, Tr. 6/24/82 at 53). The experts did agree on one conclusion. While the normal life expectancy of a man Powers' age at the time of trial would have been 19.72 years (Martin, Tr. 4/1/82 at 65), the plaintiff's pulmonary problems and associated respiratory difficulties (to a large extent unrelated to the medical problems at bar) would reduce his life expectancy by at least several years, if not more. The estimates of the plaintiff's expert witnesses hovered at or just below the 15-year mark. (Rie, Tr. 6/23/82 at 156; Sagall, Tr. 6/24/82 at 52; Make, Tr. 6/10/82 at 60) while those of the defendant's expert witnesses averaged from 2½—5 years (Shirley, Tr. 6/3/82 at 37; Shayevitz, Tr. 6/10/82 at 32; Schachter, Tr. 7/23/82 at 94; Yarrows, Tr. 6/9/82 at 94). The Court finds a fair evaluation of the plaintiff's life expectancy, weighing the plaintiff's medical problems, the opportunity of the expert witnesses to view and to examine the plaintiff and his medical history, the qualifications and expertise of the various expert witnesses, and the credibility of their several theories, to be 12 years.

### 2. *Discount Factor*

■ All questions of damages in Federal Tort Claims Act cases must be determined by the law of the state in which the tort has occurred. *Richards v. United States*, 369 U.S. 1, 11, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962), *Klein v. United States*, 339 F.2d 512, 517 (2d Cir.1964). Connecticut tort law states that, insofar as a present award of damages will be made in place of sums which the plaintiff would have received periodically, in the future, an appropriate discount rate must be determined by which to reduce the future award to its present value. *Feldman v. Allegheny Airlines, Inc.*, 382 F.Supp. 1271, 1288 (D.Conn.1974), *aff'd in pertinent part* 524 F.2d 384 (2d Cir.1975)[3]. The discount rate

**3.** While *Feldman, infra,* states that Connecticut law applies the process of discounting only to the "destruction of earning capacity," this Court finds that it should also discount the award for future medical expenses to its present value. As both *Feldman* and the Connecticut case upon which it relies, *Chase v. Fitzgerald*, 132 Conn. 461, 45 A.2d 789 (1946) were wrongful death cases, in which, quite obviously, future medical expenses were not at issue, their limitation of the process of discounting to future diminution of earning capacity is not dispositive here. In

must reflect both (1) "the probable rate of return on a prudent investment" and (2) the "effect [which] inflation will have on interest rates in the future." *Id.*, at 1288–89. Dr. Ward Curran, defendant's expert witness, balanced likely inflation rates against probable interest rates, and testified that the Court should adopt a 2% discount rate. (Curran, Tr. 6/11/82 at 17). Finding Dr. Curran's testimony credible, convincing and consistent with the recent Second Circuit case of *Doca v. Marina Mercante*, 634 F.2d 30, 39–40 (2d Cir.1980), *cert. denied*, 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351, the Court finds that a discount rate of 2% is appropriate in this case.

### 3. *Special Damages*

#### a. *Introduction*

Several points must be mentioned before the Court engages in its specific, itemized discussion of special damages. First, in a negligence action in Connecticut, a plaintiff may recover for past and future medical expenses, destruction of earning capacity, both past and future, and damages for pain and suffering. *See*, e.g., *Delott v. Roraback*, 179 Conn. 406, 426 A.2d 791 (1980). As the plaintiff did not place into evidence any record of past medical expenses, no such damages for past medical expenses will be awarded. Moreover, under *United States v. Brooks*, 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200 (1949) and its progeny, a plaintiff can receive no award for damages "on account of hospital or medical expenses which the government had paid." *U.S. v. Brooks*, 176 F.2d 482, 484, *on remand from* 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200, *supra*. Thus, the plaintiff has no claim for hospitalization or medical benefits which he received *gratis* during his several stays at Veterans' Administration hospitals. The other elements

of tort damages in Connecticut will be treated individually after this preliminary discussion.

Secondly, the Court makes no award of damages for the so-called "California operation" which the plaintiff expressed an interest in undergoing. This procedure involves the insertion of an electrode into brain tissue surrounding the central core of the brain. Theoretically, when this electrode is stimulated, pain will be eradicated without affecting other parts of the brain, or their functions. (Owens, Tr. 3/30/82 at 163). This procedure has only been experimented with since 1979. (Owens, Tr. 3/31/82 at 253). Considering all the expert testimony adduced regarding the "California operation," including that of both Dr. Owens, the plaintiff's expert, and Dr. Sweet, the defendant's expert, the Court finds that this procedure is, as yet, too novel, its dangers too great, and its benefits too speculative to justify an award of damages for it. Therefore, no damages for the prospective "California operation" shall be awarded.

Thirdly, considering the medical problems of the plaintiff, his associated psychological traumas, and his rather intractable attitude toward rehabilitation, the Court finds that a structured, regimented multi-disciplinary approach to rehabilitation is warranted for Mr. Powers for approximately 6 months. In this regard, the Court finds credible and convincing the testimony of the plaintiff's physician, Dr. Harvey Fritz, who suggested that the plaintiff needs an intensive rehabilitation center like Gaylord Hospital in Wallingford, Connecticut, or the Cornell Medical School's White Plains, New York facility. Such a facility would offer tremendous assistance, as well as cardiopulmonary, neurological, and orthopedic rehabilitation. (Fritz, Tr. 6/25/82

this case, since the plaintiff will receive a lump-sum payment from the government in compensation for his future medical expenses, the award therefor is clearly susceptible to the "discounting" analysis of balancing a prudential rate of return against the ravages of inflation thereupon. This conclusion is buttressed by the

plaintiff's own presentation of his claim for damages, in which the plaintiff's economic expert "calculated present value of *each element* of Mr. Powers' special damages" (Plaintiff's Trial Brief, Proposed Findings of Fact and Conclusions of Law at 145) (emphasis added), by means of his proposed discounting factor, ½%.

at 215–17). The Court finds, in addition, that such a placement might conceivably rejuvenate the plaintiff's hope and motivate him in rehabilitating himself as much as possible, through simple hard work with the aid of well-trained specialists. The Court notes, however, that such a facility is not the final solution to Mr. Powers' medical situation. A facility like Gaylord only keeps a patient for a finite period, such as 6 months, and then requires re-evaluation of said patient before deciding whether or not to continue providing care to said patient. The Court, therefore, shall compute the plaintiff's damages on the basis of 6 months in a comprehensive, structured atmosphere such as that of Gaylord, and then 11½ years (the remainder of the plaintiff's life expectancy) of out-patient care and nursing assistance at home. The Court finds that such a system would best satisfy both the plaintiff's medical and psychological needs.

### b. *Six Months Structured Rehabilitation at a Multi-Disciplinary Facility*

█ The approximate cost of a facility such as the Gaylord Hospital or Cornell Medical School at White Plains is $350 per day. This figure includes the costs of medication, physical and whatever other forms of therapy the plaintiff's condition would require, and the visits of medical specialists. Multiplying $350 per day times 183 days, the Court reaches a figure of $64,-050.00 for 6 months of structured, intensive rehabilitation for the plaintiff. The Court will not discount this amount, because the expense will be due comparatively quickly. Payment for the plaintiff's 6 months of rehabilitation will be expected in the near future; the plaintiff, therefore, will not have the same use of this particular sum for investment purposes as he will have for the remainder of his award. Discounting, therefore, is not appropriate for this portion of the plaintiff's damage award.

### c. *Home and Outpatient Medical Care*

Subtracting the six months of rehabilitative therapy referred to above, from the plaintiff's life expectancy of 12 years, the Court reaches a figure of 11½ years of home and outpatient medical care required. As the plaintiff's expert's charts for discounting special damages (see Plaintiff's Trial Brief at 216–27) do not use a multiplier of 11½ years, the Court, in computing the remainder of special damages, returned to the annual figures either stipulated to or proven for each unit of home and outpatient health care, multiplied these figures by 11½ years, and then discounted them by 2% over 12 years, the plaintiff's expected life use thereof. For this reason, the Court's 11½-year figures are slightly lower than the plaintiff's 12-year figures. *Id.*, at 220.

█ Nursing care will be, by far, the largest single part of the plaintiff's home health care expenditure. For the following reasons, the Court finds that the plaintiff requires 16 hours per day of non-agency L.P.N. care.

The Court has had the opportunity to view the plaintiff both in person, at trial, and on videotape at home, walking, getting out of bed, and performing simple tasks. (Plaintiff's Exhibit 127). In addition, the Court has heard hours of testimony about what the plaintiff can and cannot do. Considering all of these factors, it appears to the Court that (1) the plaintiff most likely does not need the special skills which an R.N. can provide, but which an L.P.N. cannot, (2) that the plaintiff, more likely than not, does indeed need someone with a basic medical understanding of his physical condition to help him around the house, to supervise his simple movement exercises and to provide immediate care to prevent the plaintiff from falling or having some other accident, and (3) that, considering the plaintiff's wife's medical condition, the plaintiff, more likely than not, needs someone to perform simple homemaking tasks, such as cooking and cleaning for him, which an L.P.N. may do, but which an R.N. will not perform. These factors indicates

that an L.P.N. would be appropriate to satisfy the plaintiff's medical needs at home.

There is no need for an L.P.N. to be present during the plaintiff's 8 hours of sleep at night. However, in light of the plaintiff's inability to perform many important tasks, it is essential that the plaintiff receive L.P.N. assistance during his waking hours, amounting to 16 hours per day.

It is not essential, however, that the plaintiff receive L.P.N. assistance through an agency. The plaintiff claims that an agency is necessary to insure continuity of care. (Plaintiff's Trial Brief at 152). This is not the case. It is more likely than not that the plaintiff will employ two L.P.N.s for 8 hours each per day. Under such a system, were one L.P.N. to resign or become ill, the other L.P.N. could work a double shift for a brief period of time, until the plaintiff could hire a new L.P.N. Such a system would guarantee continuity of care and obviate the plaintiff's only stated concern necessitating agency care.

Moving to the calculation of non-agency L.P.N. care, the Court begins with the parties' stipulation of the hourly cost of such care: $8.50 per hour. (Plaintiff's Exhibit 208). Multiplying 16 hours a day times 7 days a week times 52 weeks a year times 11½ years, the Court finds that 16 hours a day over the course of 11½ years amounts to 66,976 hours. Multiplying the total hours times $8.50 per hour yields a pre-discounted product of $569,296.00. Discounting this product by 2% over 12 years,[4] the Court finds the present award for L.P.N. care to be $448,885.91.

▆▆▆ Both before and after the fusion at issue, the plaintiff has not been conscientious and cooperative about the physical therapy offered to him. (Defendant's Exhibit FFFF at 5; Defendant's Exhibit HH; LaBissoniere, Tr. 5/26/82 at 81, 170, 174). Thus, although the plaintiff has requested damages for three visits by physical therapists per week (Plaintiff's Trial Brief at

216–27), it is more likely than not that the plaintiff will only participate in physical therapy two times per week. This appears to be the minimal amount of physical therapy necessary to prevent future atrophication of the plaintiff's arms. (Robinson, Tr. 6/17/82 at 109–10).

The parties stipulated to a physical therapy cost of $35 per visit. (Plaintiff's Exhibit 208). Two visits a week are 104 visits a year, or 1196 visits over 11½ years. Multiplying these visits times $35 a visit yields a product of $41,860.00. Discounting this product by 2% over 12 years, the Court finds the present value of physical care to be $33,006.32.

The plaintiff presented uncontroverted evidence that he would have to visit three specialists: a physiatrist, a neurologist, and an orthopedist at least once every other month at an estimated cost of $50 per visit. (Owens, Tr. 3/30/82 at 162). Multiplying $50 a visit times 18 visits to these three specialists per year over the course of 11½ years produces $10,350.00 prediscounted gross cost. Discounting this figure by 2% over 12 years, the Court finds a present value of $8,160.90 for visits to specialists.

The plaintiff introduced virtually uncontroverted, highly credible evidence that the plaintiff would spend approximately $1.50 per day on prescription medications for the remainder of his life. (Owens, Tr. 3/31/82 at 260–62, 265). Multiplying this figure times 365 days a year for 11½ years furnishes $6,296.25 of pre-discounted cost for medications. Discounting this total by 2% over 12 years, the Court finds the present value of an award for medication to be $4,964.55.

### d. Lost Wages

The Court finds that, had the cervical fusion which caused this controversy been performed properly, the plaintiff would have resumed employment 6 months after the operation (Hillemeir, Tr. 2/24/82 at

---

**4.** The Court's source for its comparison of a 2% discount rate over 12 years is D. Thorndike, *Thorndike Encyclopedia of Banking and Finan-* *cial Tables* (1980 revision), at 8–479, "Annual Compound Interest and Annuity—2%" ("Present Worth of 1" Column, at year 12).

228), or approximately December 1, 1974. The Court further finds that the plaintiff would have worked, more likely than not, until his 65th birthday, September 1, 1990. This means that the defendant is liable to the plaintiff for destruction of the plaintiff's earning capacity for the period of time from December 1, 1974 through September 1, 1990.

Using the plaintiff's actual 1971 income tax return as his base, the plaintiff's economic expert witness, Dr. Richard H. Martin proceeded to calculate the plaintiff's lost wages. (Martin, Tr. 4/1/82 at 65, 84–86). As Dr. Martin worked from slightly different assumptions than does the Court now, his final totals are not, in all respects, relevant here. However, Dr. Martin's baseline figures are both highly credible and not controverted by the defendant. These figures are eminently helpful to the Court's calculation, and have been employed accordingly.

Adjusting the plaintiff's actual 1971 income, $7,168.00 (Martin, Tr. 4/1/82 at 65) upwards to account for inflation and normal economic raises, Dr. Martin proposed that the plaintiff's 1974 income would have been $8,580.00. (*Id.* at 85). One-twelfth of that, which would be the plaintiff's income for December, the only month in which the Court finds that the plaintiff would have worked in 1974, totals $715.00. Between the years 1974–81, inclusive, Dr. Martin factored in a 7.2% compound interest rate to arrive at an income of $14,128.00 for 1981. (*Id.* at 86). Adjusting the plaintiff's income upwardly in equal increments over this period, the Court finds lost wages of $9,372.57 for 1975, $10,165.14 for 1976, $10,957.71 for 1977, $11,750.28 for 1978, $12,542.85 for 1979, and $13,335.42 for 1980. In addition, Dr. Martin hypothesized that the plaintiff's income would be frozen at $14,128.00 from 1981 through and including 1990. (*Id.* at 85–86). The Court adheres to these figures, but assesses the 1990 wages at $9,418.67, two-thirds of $14,-128.00, to account for the plaintiff's predicted retirement on September 1, 1990. The pre-discounted total of these lost wages is $205,049.64. Discounting this

sum by 2% over 12 years, the Court finds that the present value of the plaintiff's award for destruction of earning capacity is $161,964.06.

4. *General Damages: Pain and Suffering*

Under Connecticut law, pain and suffering is a compensable element of personal injury damages "even which such pain and suffering is evidenced conclusively by the plaintiff's subjective complaints." *Delott, supra,* 179 Conn. at 409, 426 A.2d 791. Therefore, notwithstanding the defendant's contentions that the plaintiff's pain is psychogenic and that the plaintiff is unduly pain prone (Defendant's Proposed Findings of Fact and Conclusions of Law at 434, *et seq.*), the Court should award damages for pain and suffering if it finds that the plaintiff suffers from pain and suffering which would have been proximately caused by the defendant's negligence.

Ample evidence exists that the plaintiff suffers pain and suffering as a direct result of the ill-fated fusion at issue here. This evidence consists not only of the plaintiff's subjective complaints, but also of the Court's observations of his condition as demonstrated on three separate videotapes (one, a "day in the life" videotape, Plaintiff's Exhibit 127, the other two depicting a test undertaken by the plaintiff under anaesthesia to display that the plaintiff was not "faking" certain injuries, Plaintiff's Exhibits 226, 227) and of voluminous medical testimony. These sources are credible, and argue convincingly for the proposition that, while the defendant contends that the pain is all in the plaintiff's head, the Court finds that it is actually in his neck and upper limbs.

Accordingly, the Court finds that the defendant's negligence proximately caused the following conditions of pain and suffering in the plaintiff: (1) his hands feel as if they are on fire; (2) he often becomes dizzy and loses his balance; (3) he can only move his left arm 30°, and then, only with great pain and difficulty; (4) he cannot form a

fist with his left hand; (5) his left wrist hurts while tightening; (6) he has extremely little strength in his right arm and hand; (7) he can only raise his right arm 160°; (8) he cannot straighten his right arm from the elbow down; (9) he suffers from a flutter in his right hand; (10) his neck is in severe pain; (11) he has difficulty cutting meat to be consumed at the dining table, he is restricted in dressing himself, brushing his teeth, placing himself in and out of a bathtub, and performing other, simple tasks; (12) he has been unable, since the fusion at issue, to engage in marital relations with his wife; and (13) he suffers from a psychological depression as a result of his physical disability, pain and suffering. The Court finds that the plaintiff has suffered these kinds of pain and disability, or similar pain and disability from the date of the operation and shall continue to experience such pain and suffering, or possibly worse pain and suffering, until he dies.

▇▇▇ The Court's calculation for pain and suffering reverts back, therefore, to the date of the operation, May 23, 1974 and continues through the projected length of the plaintiff's life, 12 years after the completion of the trial, or July 30, 1994. Considering all the factors listed in the previous paragraph, the Court awards an average of $20,000.00 per year for the plaintiff's pain and suffering. The Second Circuit has held, however, that pain and suffering should be broken down into two categories, past and future, and that damages for future pain and suffering, if awarded in a lump sum, should be discounted to present value. *Gretchen v. United States,* 618 F.2d 177, 180–81 (2d Cir.1980).

The Court finds that the plaintiff experienced past pain and suffering from May 23, 1974 until July 30, 1982, a period of 8.189 years. Valuing this pain and suffering at $20,000.00 a year as stated above, the Court grants a total award for past pain and suffering of $163,780.00. Future pain and suffering, measured from July 31, 1982 through and including July 30, 1994, a period of 12 years, equals $240,000.00. Applying the 2% discount rate to this figure for 12 years, the Court finds the present value of the damages for future pain and suffering to be $189,238.32. The Court, therefore, awards total damages for pain and suffering, in the sum of $353,018.32.

### 5. Set-Off

▇▇▇ In Federal Tort Claims suits in which the injured party has already received, or may, at some future time receive benefits from the government, whether these benefits be monetary or in-kind, the guiding principle is that the government, like any other tortfeasor, does not have "to pay twice for the same injury." *Brooks v. United States,* 337 U.S. 49, 53, 69 S.Ct. 918, 920, 93 L.Ed. 1200 (1949). *U.S. v. Brown,* 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954) specifically applied this principle to injuries suffered in a Veterans' Administration hospital by a veteran. This principle precludes a second payment in tort by the government when the "elements of tort damages [are] the equivalent of elements taken into account in providing disability" benefits. *Brooks, supra,* at 49–50, 69 S.Ct. at 918–919. This principle possibly applies to three sources of benefits for the plaintiff: (1) past medical benefits, i.e., medical benefits and hospitalization received by the plaintiff prior to this litigation, (2) future medical benefits, i.e., the hospitalization and other medical care available free of charge to the plaintiff as a result of the fusion at issue, and (3) the plaintiff's 38 U.S.C. § 351 benefits, monetary payments already awarded, and presently being awarded to the plaintiff by the defendant to compensate him for damages arising out of the fusion in litigation. The Court shall address each item separately.

On remand from the Supreme Court, the Fourth Circuit in *U.S. v. Brooks,* 176 F.2d 482, 484 (4th Cir.1949) held that "in making the award of damages to plaintiff nothing should be included on account of hospital or medical expenses which the government has paid." *A fortiori,* this holding extends to hospitalization or medical expenses which the government has already provided free of charge to the plaintiff. However,

in this case, as the plaintiff has included no claim for past medical expenditures, no award has, in fact, been made for them by the Court. As such, there is no award against which a set-off could be taken. The Court, therefore, finds no set-off necessary for past medical expenses.

Much more problematic are the potential hospitalization and medical benefits available to the plaintiff in the future. Before the fusion at issue, the plaintiff was a non-service-connected disabled veteran with an honorable discharge. (Como, Tr. 6/10/82 at 24). As a result of the fusion at issue, the government changed the plaintiff's categorization to that of a 100% service-connected disabled veteran. (*Id.* at 14). Under the statutory authority of 38 U.S.C. § 610 *et seq.*, he is now eligible for (1) continued care at any Veterans' Administration facility in the country on either an in-patient or an out-patient basis, (2) total treatment at any private nursing home with which the Veterans' Administration has a contract for the rest of his life or as long as such treatment is deemed medically necessary, and (3) any surgical and medical procedure performed outside the Veterans' Administration, as long as such procedure is approved by a supervising Veterans' Administration physician. (*Id.* at 14, 22–24, 27–29). By contrast, while the plaintiff formerly, as a non-service-connected disabled veteran, could have received the same in-patient treatment as a service-connected veteran, he could have received only extremely limited out-patient care. (*Id.* at 51 [5]). As a practical matter, the fusion at issue here has enabled the plaintiff to receive full out-patient treatment at any Veterans' Administration facility in the country free of charge, as well as nursing home treatment, or any other surgical or medical procedures outside the Veterans' Administration system free of charge, if a supervising Veterans' Administration physician decides that such nursing home care or medical procedure is medically necessary. Thus

arises the problem of a double payment by the government: the tort damages awarded here may be compensating the plaintiff for medical treatment which he potentially could receive *gratis* under Veterans' Administration regulations.

■■■ In discussing a potential double recovery for several plaintiffs under similar circumstances, the Fourth Circuit stated that the "trial court must deal with [the uncertainty of a double recovery] as it deals with other uncertainties by using its best judgment after all the facts and circumstances of the case have been taken into consideration." · *Brooks, supra,* 176 F.2d at 484. Considering all the facts of this case, the Court decides not to set off the value of possible, further medical benefits which the plaintiff may receive under Veterans' Administration regulations at some point in the future. The amount of such possible, prospective medical benefits, if any, is far too speculative for the Court to place a figure upon. Moreover, were the Court to deduct a set-off for possible, prospective medical benefits, the set-off would, as a practical matter, unduly limit and virtually pre-determine not only the kind of medical care necessary for the treatment of the plaintiff's condition, but also the source of such medical care. *Feeley v. United States,* 337 F.2d 924, 934–35 (3d Cir.1964). This pre-determination would be somewhat burdensome because the plaintiff could not receive nursing home care or undergo outside surgical procedures without the approval of a Veterans' Administration physician. This pre-determination, moreover, would be especially onerous if it were to force the plaintiff to undergo treatment at a Veterans' Administration facility whose sister facility has caused the plaintiff to suffer the damages found in this case. These factors cause the Court to deny allocating a set-off for speculative, future Veterans' Administration medical benefits. The Court wishes to emphasize, however,

**5.** A non-service-connected veteran is eligible to receive out-patient care only in the form of either ambulatory care to "obviate the need for hospitalization for 30 to 35 days or post-hospital

care after he was an in-patient for up to a year." This limited outpatient care, however, may be extended upon review by a supervising physician. Tr. 6/10/82 at 51.

that proper Congressional action, such as tying in the set-off provision of 38 U.S.C. § 351, *infra*, to the medical treatment available to veterans under 38 U.S.C. § 610 *et seq.* would eliminate not only the windfall conundrum which confronts and concerns federal courts under these, or similar circumstances, but also protect the federal treasury from the threat of an unnecessary double payment for the same injury.

▉ The issue of § 351 benefits presents no such conundrum for the Court. This section states, in pertinent part, that:

"Where any veteran shall have suffered an injury, or an aggravation of an injury, as a result of ... medical or surgical treatment, ... awarded under any of the laws administered by the Veterans' Administration, ... and not the result of such veteran's own willful misconduct, and such injury or aggravation results in additional disability to ... such veteran, disability ... compensation under this chapter ... shall be awarded in the same manner as if such disability [or] aggravation, ... were service-connected. Where an individual is, on or after December 1, 1962, awarded a judgment against the United States in a civil action brought pursuant to section 1346(b) of title 28, United States Code, or, on or after December 1, 1962, enters into a settlement or compromise under section 2672 or 2677 of title 28, United States Code, by reason of a disability [or] aggravation, ... treated pursuant to this section as if it were service-connected, then no benefits shall be paid to such individual for any month beginning after the date of such judgment, settlement, or compromise on account of such disability [or] aggravation ... becomes final until the aggregate amount of benefits which would be paid but for this sentence equals the total amount included in such judgment, settlement, or compromise." 38 U.S.C. § 351.

The United States Supreme Court has recently construed this statute to mean that the § 351 "benefits payments must be set off against the damages awarded in tort; and the increment in future monthly benefits is not [to be] paid until the aggregate amount of the benefits withheld equals the damages awarded." *United States v. Kubrick*, 444 U.S. 111, 116, n. 5, 100 S.Ct. 352, 356, n. 5 (1979). Thus, all § 351 damages paid to the plaintiff before the date of this judgment must be set off against his tort award, and all further § 351 benefits curtailed until such time as the sum thereof reaches the amount of damages awarded in this case. As of March 31, 1982, the plaintiff has received $100,592.67 in § 351 benefits. (Defendant's Exhibit SSSS). Therefore, the Court orders a set-off of that amount plus all § 351 benefits paid to the plaintiff from April 1, 1982 until the date of this judgment.

### 6. The Administrative Ad Damnum Clause and 28 U.S.C. § 2675(b)

The administrative claim in this case was filed in February, 1976, in the amount of $1,000,000.00 (Defendant's Exhibit RRRR). The original complaint in this case requested $2,000,000.00 worth of relief. In February, 1981, the plaintiff amended his claim to seek damages of $10,000,000.00. On February 22, 1982, the defendant filed a motion to reduce the ad damnum clause to the amount requested in the administrative claim, $1,000,000.00. Although the net amount of the plaintiff's recovery in this case, after set-off, will fall below the $1,000,000.00 claimed in the administrative complaint, the gross award, prior to set-off, is slightly more, $1,074,050.06 to be exact. Thus, the Court shall address the defendant's motion.

▉ The defendant's motion to reduce the ad damnum clause, and hence, to reduce the plaintiff's ultimate recovery, relies upon 28 U.S.C. § 2675(b), which provides, in pertinent part that:

"Action under [the Federal Tort Claims Act] shall not be instituted for any sum in excess of the amount presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the

claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim." The defendant argues that the Federal Tort Claims Act, of which § 2675(b) is a part, is a limited waiver of the sovereign immunity of the United States, and thus should be strictly construed. The defendant contends further that § 2675(b) mandates that, unless the plaintiff satisfies at least one of the two exceptions cited in the statute, namely by either presenting newly discovered evidence which was not reasonably discoverable at the time of the administrative complaint, or by proving intervening facts which would enhance the amount claimed, the plaintiff cannot recover more than the amount originally claimed in the administrative complaint, $1,000,000.00. While the Court agrees, in substance, with the defendant's statement of the relevant law, it finds that in this case, the plaintiff has satisfied his burden of proving that the exceptions to § 2675(b) do apply.

"Considerable discretion is vested in the District Courts to determine what constitutes 'newly discovered evidence not reasonably discoverable' at the time the claim was presented, or what is tantamount to 'intervening facts, relating to the amount of the claim.'" *Nichols v. United States,* 147 F.Supp. 6, 9 (E.D.Va.1957). Diagnoses which are merely cumulative and confirmatory of previous diagnoses do not constitute either "newly discovered evidence" or "intervening facts," for the purposes of this statute. *Kielwien v. United States,* 540 F.2d 676, 680–81 (4th Cir.1976), *cert. denied,* 429 U.S. 979, 97 S.Ct. 491, 50 L.Ed.2d 588. However, when a plaintiff does not know fully the "medical extent of his injuries and expenses" at the time of his administrative complaint, the exceptions to § 2675(b) are triggered. *Rabovsky v. United States,* 265 F.Supp. 587, 588 (D.Conn.1967), *Campbell v. U.S.,* 534 F.Supp. 762, 766 (D.Haw.1982).

Considering the facts of this case, the Court finds that Powers' situation fits more precisely into the latter category than the former. Although the plaintiff's administrative complaint (Defendant's Exhibit RRRR) alleged a general postoperative paralysis of both arms, the increasing degree of such paralysis, the muscular atrophy, the worsening pain associated therewith, and the unanticipated need for extensive nursing care, arising from the substantial deterioration of the health of both Mrs. Powers, who previously could have been looked to for assistance and of the plaintiff, constitute "newly discovered evidence not reasonably discoverable" in 1976 and "intervening facts, relating to the amount of the claim." Thus, the Court finds that the plaintiff can collect a gross, pre set-off award amounting to more than the $1,000,-000.00 he requested in his administrative complaint.

## C. *Conclusion*

The Court finds that the defendant is liable in damages to the plaintiff. The Court awards $721,031.74 in special damages and $353,018.32 in general damages. The sub-total of damages amounts to $1,074,050.06, against which a set-off of the sum of $100,592.67 and all § 351 damages received by the plaintiff from April 1, 1982 through and including the date of this judgment, shall be assessed.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law in accordance with Fed.R.Civ.P. 52(a).

SO ORDERED.